No. 25-1730

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**PSEG RENEWABLE TRANSMISSION LLC,**

*Appellee,*

**v.**

**ARENTZ FAMILY, LP, *et al.*,**

*Appellants.*

_____

On Appeal from the United States District Court for the District of Maryland

(Adam B. Abelson, United States District Judge)

_____

## APPELLANTS' BRIEF

_____

HARRIS W. EISENSTEIN
DAVID M. WYAND
LAUREN M. MCLARNEY
Rosenberg Martin Greenberg, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
heisenstein@rosenbergmartin.com
dwyand@rosenbergmartin.com
lmclarney@rosenbergmartin.com
(410) 727-6600
(410) 727-1115 (facsimile)

*Attorneys for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1730        Caption: PSEG Renewable Transmission LLC v. Arentz Family, LP, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Barney's Farm, LLC
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☑YES ☐NO

2.   Does party/amicus have any parent corporations?                           ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                               ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand

Date: July 14, 2025

Counsel for: Barney's Farm, LLC

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1730__     Caption: __PSEG Renewable Transmission LLC v. Arentz Family, LP, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Arentz Family, L.P._____
(name of party/amicus)


_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?        ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

      Arentz Hay & Grain, Inc.


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☑YES ☐NO
If yes, identify entity and nature of interest:
Arentz Hay & Grain, Inc.


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ David M. Wyand                        Date:        July 14, 2025

Counsel for: Arentz Family, L.P.

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  25-1730          Caption:  PSEG RenewableTransmission, LLC v. Arentz Family, LP, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

M & R LLC
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand                    Date: _____July 14, 2025_____

Counsel for: M & R LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1730__    Caption: __PSEG RenewableTransmission, LLC v. Arentz Family, LP, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Dug Hill Rod and Gun Club, Inc.__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand                    Date:        July 14, 2025

Counsel for: The Dug Hill Rod and Gun Club, Inc.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1730_        Caption: _PSEG RenewableTransmission, LLC v. Arentz Family, LP, et al_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Troyer Farms, LLC_
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand _____     Date: _____July 14, 2025_____

Counsel for: Troyer Farms, LLC _____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1730          Caption: PSEG RenewableTransmission, LLC v. Arentz Family, LP, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Troyer Real Estate, LLC
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand               Date:      July 14, 2025

Counsel for: Troyer Real Estate, LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1730__     Caption: __PSEG RenewableTransmission, LLC v. Arentz Family, LP, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__HZ Properties, LLC__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David M. Wyand                    Date: _____July 14, 2025_____

Counsel for: HZ Properties, LLC

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1730__          Caption: __PSEG Renewable Transmission, LLC v. Arentz Family, LP, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Attached Named Appellants__
(name of party/amicus)

_____

who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Harris W. Eisenstein        Date:    July 28, 2025

Counsel for: Appellants

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| **PSEG RENEWABLE TRANSMISSION LLC** | |
| *Appellee* | |
| v. | **Appeal No: 25-1730** |
| **ARENTZ FAMILY, LP,** *et al.* | |
| *Appellants* | |

## CONTINUATION SHEET FOR DISCLOSURE STATEMENT

I, Harris W. Eisenstein of Rosenberg Martin Greenberg, LLP, am counsel for the following Appellants: Arentz Family, LP, Barney's Farm, LLC, Charles William Bond, Morgan Davis Bond, Charlotte Ruth Bixler, Morris L. Bohlayer, Sharon A. Bohlayer, Gary J. Brockmeyer, Nancy M. Brockmeyer, Esther Johann Lentz-Buenger, Helen L. Bull, Chistopher D. Cockey, Carmen Cockey, Thomas B. Collins, Tracey W. Collins, Diane M. Cook, James R. Cook, Robert L. Donmoyer, Dorothy I. Donmoyer, Petrice Marie Donmoyer-Resh, Richard M. Doster, The Dug Hill Rod & Gun Club, Keith Emerson Ensor, Kevin Lee Ensor, Zhejun Fan, Joseph L. Gover, Raina C. Gover, HZ Properties, LLC, Bryan Hendrix, Connie Hendrix, Kimberly A. Johnston, Mohamad A. Kourani, Nada E. Kourani, Julia Lu, M & R, LLC, John D. Meader, Deborah H. Maeder, Nancy P. MacBride, Andrew D. McLean, Rebecca McLean, Carl E. Miller, Betty Lou Miller (Deceased), Catherine V. Miller, Kenneth E. Miller, Fay Ann Miller, Wayne D. Miller, Benjamin Eugene Nusbaum, Kenneth Eugene Nusbaum, Chris N. Resh,  Rebecca Irene Scollan, Robert H. Stickles, Sr., Alene R. Stickles, Erich Charles Steiger, Troyer Farms, LLC, Troyer Real Estate, LLC, Matt Unkle, Tomi Unkle, Leslie Alfred White, Justin Wright, and Amy Gayle Youngblood.

1

Each of the above individual-Appellants are listed for inclusion in the Disclosure Statement filed on July 28, 2025.  All entity-Appellants previously filed Disclosure Statements.

/s/ Harris W. Eisenstein
Harris W. Eisenstein

2

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE..............................................................2

    I.    The Regulatory Scheme ...........................................................2

    II.   The MPRP ...............................................................................3

    III.  The PSC Proceeding.................................................................6

    IV.  Expedited Proceedings Before the District Court ......................7

SUMMARY OF ARGUMENT.............................................................8

STANDARD OF REVIEW .................................................................10

ARGUMENT ....................................................................................10

    I.    The District Court Erred in Entering a Mandatory
          Preliminary Injunction..............................................................10

    II.   PSEG Did Not Prove the Four Factors for Injunctive Relief...................12

          1.  PSEG cannot succeed on the merits because it does not
              have the power of eminent domain .....................................13

              a.  Based on the plain language of RP §12-111
                  and PU §7-207, PSEG has no pre-condemnation
                  access authority ........................................................14

              b.  PPRP's asserted need for information does not justify
                  extending RP §12-111 to entities that do not have the
                  power of eminent domain..........................................19

c.  Principles of statutory construction dictate that
RP §12-111 may not be invoked by an entity that
does not have the power of eminent domain,
regardless of an asserted need to access properties ...............22

d.  The reference to future public use in RP §12-111
does not indicate that PSEG has the power of
eminent domain .....................................................................27

e.  PSEG is not an agent of PPRP, DNR, or any other
State agency ..........................................................................29

f.  Federal law cannot give PSEG the power of
eminent domain ....................................................................30

g.  The Maryland Circuit Court opinion in *Transource*
does not support PSEG's interpretation ..................................33

2.  The district court erred in concluding that PSEG would
suffer irreparable economic harm absent injunctive relief .................34

3.  The balance of equities did not favor injunctive relief ......................45

4.  The public interest decisively favors vacating the injunction ............52

CONCLUSION ............................................................................................55

REQUEST FOR ORAL ARGUMENT .................................................................56

iii

# TABLE OF AUTHORITIES

## CASES

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*,
139 F.4th 404 (4th Cir. 2025) .................................................................10, 11

*Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 2313244
(4th Cir. Aug. 12, 2025) ....................................................................12, 13, 44

*Ark. Game & Fish Comm'n v. U.S.,* 568 U.S. 23 (2012) .........................................49

*Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*,
635 F. Supp. 3d 392 (D. Md. 2022) ...............................................................40

*Broadway Servs., Inc. v. Comptroller of Maryland*, 478 Md. 200 (2022)...............29

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .............................................47

*Coastland Corp. v. Third Nat. Mortg. Co.*, 611 F.2d 969 (4th Cir. 1979) ..............42

*Daily Caller v. U.S. Department of State*, 152 F. Supp. 3d 1
(D.D.C. 2015) ..................................................................................................12

*Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 166 Md. 118 (1934) ........................25

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802
(4th Cir. 1991)...................................................................................40, 44, 45

*Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of New York,* 544 F.2d 571
(2d Cir. 1976) ..................................................................................................12

*Dorfmann v. Boozer,* 414 F.2d 1168 (D.C. Cir. 1969)............................................12

*E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004).........42, 43, 44, 53

*Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781
(4th Cir. 1991)..................................................................................................10

*Hughes Network Sys., Inc. v. InterDigital Communications Corp.*,
    17 F.3d 691(4th Cir. 1994) ................................................................41

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003)
    *abrogated on other grounds by*
    *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ..............................35

*J.L. Matthews, Inc. v. Maryland-Nat'l Capital Park & Planning Comm'n*,
    368 Md. 71 (2002) .........................................................................49

*King v. Mayor & Council of Rockville*, 52 Md. App. 113 (1982) ......................14, 26

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    979 F.3d 219 (4th Cir. 2020),
    *on reh'g en banc*, 2 F.4th 330 (4th Cir. 2021) ................................................12

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .........................................................................10

*Litz v. Maryland Dept. of Env't*, 446 Md. 254 (2016) ............................................49

*Mackie v. Mayor and Com'rs of Town of Elkton*, 265 Md. 410 (1972) .......20, 23, 50

*Moore v. State*, 388 Md. 446 (2005) ........................................................................17

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
    *Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ..........*passim*

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) ...................................................25

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) .........................................................50

*Pers. v. Mayor & City Council of Baltimore*,
    437 F. Supp. 2d 476 (D. Md. 2006) ..........................................................41

*Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194 (4th Cir. 2024) ............11

*Reichs Ford Rd. Joint Venture v. State Roads Comm'n*
    *of the State Highway Admin.*, 388 Md. 500 (2005) ......................................48

*Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins*, LLC,
    412 Md. 308 (2010) ..................................................................25

*Scriber v. State*, 437 Md. 399 (2014) ..........................................22

*SH Franchising, LLC v. Newlands Homecare, LLC*,
    No. CV CCB-18-2104, 2019 WL 356658 (D. Md. Jan. 29, 2019) ..............40

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
    696 F.3d 771 (8th Cir. 2012) .........................................36

*Sokel v. Nickoli*, 97 N.W.2d 1 (Mich. 1959) ...............................48

*State Roads Comm'n v. Jones,* 241 Md. 246 (1966) ..............................50

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)..................................................48

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)......................................9, 10, 13, 34, 45

## STATUTES, REGULATIONS & CONSTITUTIONAL PROVISIONS

15 U.S.C. §717f(h) ......................................................3

16 U.S.C. §824(a) .....................................................2, 31

16 U.S.C. §824(b)(1)......................................................3

16 U.S.C. §824p ........................................................31

16 U.S.C. §824s ..........................................................3

28 U.S.C. §1292(a)(1) ....................................................1

28 U.S.C. §1332(a) .......................................................1

COMAR 20.79.01.07 ......................................................36

Md. Code, Nat. Res. §3-305(f) .....................................21, 23, 26

Md. Code, Nat. Res. §3-306 ...........................................................19, 21, 22, 23, 24

Md. Code, Pub. Util. §1-101(i) ..............................................................16, 33

Md. Code, Pub. Util. §3-101 *et seq.* ...........................................................6

Md. Code, Pub. Util. §7-101 *et seq.* ...........................................................6

Md. Code, Pub. Util. §7-207...............................................................*passim*

Md. Code, Real Prop. §12-111.............................................................*passim*

Md. Const. Art. III, §40.............................................................................48

U.S. Const. Amend. V.................................................................................48

## OTHER AUTHORITIES

FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) ...................2, 31

*In re Application of PSEG Renewable Transmission LLC*, Case No. 9773
    (Md. Pub. Serv. Comm'n 2024) ......................................................................6

Laws of Maryland, 1916 Ch. 649 ................................................................28

Laws of Maryland, 1963 Ch. 52 .................................................................28

Laws of Maryland, 1981, Ch. 520 (S.B. 215)..............................................20

Laws of Maryland, 1984, Ch. 601 (H.B. 250)...................................21, 23

Laws of Maryland, 2017 Ch. 840 (S.B. 969).......................................17, 32

Marin Scotten, *More transmission line conflicts expected as US
    electricity demand booms*, BALT. BANNER (Apr. 15, 2025) ..........................3

Order Establishing Procedural Schedule for the MPRP
    (filed September 11, 2025, PSC Docket No. 639) .................7, 36, 37, 38, 39

*Potomac-Appalachian Transmission Highline, LLC & PJM Interconnection, L.L.C.*, 152 FERC ¶63,025, 66,165 (2015) ........................42

*PPL Electric Utilities Corp.*, 189 FERC ¶61,084 (2024) ...........................................3

*PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024) .....................................4, 5, 37

Report of the Legislative Council Committee to Revise the Condemnation Laws of Maryland, November 14, 1962 ...............................26

## JURISDICTIONAL STATEMENT

On April 15, 2025, PSEG Renewable Transmission, LLC ("Appellee" or "PSEG"), a private company from New Jersey, filed a Petition and contemporaneous Motion for Preliminary Injunction in the United States District Court for the District of Maryland, invoking the district court's diversity jurisdiction under 28 U.S.C. §1332(a). The district court entered a mandatory Preliminary Injunction on June 20, 2025. JA2522. Appellants timely noted an appeal on June 24, 2025. JA2523. On July 11, 2025, the district court entered an Amended Preliminary Injunction. JA2547. In an abundance of caution, Appellants filed an Amended Notice of Appeal on July 18, 2025, referencing the Amended Preliminary Injunction. JA2549. The appeal is from an interlocutory order of the district court granting a preliminary injunction and is therefore appealable under 28 U.S.C. §1292(a)(1).

## ISSUES PRESENTED FOR REVEW

I.    Did the district court err in granting a mandatory preliminary injunction, which is the ultimate relief in this case, without the benefit of a complete factual record?

II.    Did the district court err in granting a preliminary injunction notwithstanding Appellee's failure to satisfy all four factors for injunctive relief?

1

III.    Did the district court err in holding that Appellee could invoke Md. Code Ann., Real Prop. §12-111 despite the absence of any Maryland statute that delegated Maryland's power of eminent domain to Appellee?

## STATEMENT OF THE CASE

PSEG is a private company from New Jersey. It does not have authority to construct the ambitious, 67-mile transmission line across Maryland known as the Maryland Piedmont Reliability Project ("MPRP"). Nor does it have authority to acquire associated property rights by eminent domain. Those foundational issues are pending before the Maryland Public Service Commission ("PSC"), which will rule in due course and after careful consideration of PSEG's pending application for a Certificate of Public Convenience and Necessity ("CPCN").

## I.    The Regulatory Scheme

The construction and siting of high-voltage electric transmission lines in the United States are subject to federal planning requirements but remain under the primary authority of the States. *See* 16 U.S.C. §824(a) (Federal Energy Regulatory Commission ("FERC") regulation "to extend only to those matters which are not subject to regulation by the States"); FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) at ¶107 ("We acknowledge that there is longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction.").

FERC oversees planning and cost allocation through regional transmission organizations, including PJM Interconnection, L.L.C. ("PJM"), and authorizes financial incentives to encourage investment. *See* 16 U.S.C. §824s (directing FERC to establish incentive-based rate treatments for transmission investments). PJM, for its part, identifies system needs and recommends projects for development within its regulated territory. *See PPL Electric Utilities Corp.*, 189 FERC ¶61,084 (2024) at P14. However, PJM's recommendations do not authorize construction nor confer rights to access or acquire land.

Unlike the Natural Gas Act ("NGA"), 15 U.S.C. §717f(h), the Federal Power Act ("FPA") preserves state jurisdiction over transmission siting and construction. 16 U.S.C. §824(b)(1). To construct a high-voltage overhead transmission line in Maryland, one must first obtain a CPCN from the PSC. Md. Code, Pub. Util. ("PU") §7-207(b)(3)(i). Without a CPCN, "a person may not begin construction… or exercise a right of condemnation with the construction." *Id.*

## II.    The MPRP

The MPRP is a proposed 67-mile, 500 kilovolt, aboveground transmission line project running through Baltimore, Carroll, and Frederick counties. It is, in effect, a long "extension cord" from the Pennsylvania line through Maryland to serve the power needs of existing or future data centers in Northern Virginia. Marin Scotten, *More transmission line conflicts expected as US electricity demand booms*, BALT.

3

BANNER (Apr. 15, 2025).[1] The proposed route cuts through multi-generational family farms and homesteads, conserved and preserved land, and property supporting myriad small businesses. *See infra* at Arg. §II, 3.

On April 11, 2024, PJM and PSEG entered into a Designated Entity Agreement ("DEA") concerning the development and construction of the MPRP. JA157. The DEA set a tight development schedule, establishing June 1, 2027 as the deadline for completing the MPRP. JA176. If construction of the MPRP is delayed, the DEA provides that PJM "shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement"[2] and determine whether to retain the MPRP. JA164.

On April 15, 2024, PSEG filed a Petition for a declaratory order authorizing its use of certain transmission rate incentives under the FPA to mitigate the risks associated with developing the MPRP. *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024).[3] In its Petition, PSEG described the

---

[1]   Available at: https://www.thebaltimorebanner.com/community/climate-environment/transmission-line-conflicts-FNBOTSALRNCK7LZYTLKQWIW3VE/ (last visited 9/16/2025).

[2] Available at: https://www.pjm.com/pjmfiles/directory/merged-tariffs/oa.pdf (last visited 9/16/2025).

[3] Available at: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240415-5328 (last visited 9/16/2025).

MPRP as "a major, linear transmission project that faces significant risks and challenges." *Id.* at 2. Among other things, PSEG "faces significant siting, permitting, environmental, and construction risks and challenges because the Project is subject to a host of federal and state regulatory approvals and permits, including the need to obtain a" CPCN from the PSC, "which is expected to be a comprehensive and potentially lengthy process." *Id.* at 3. PSEG also noted that the MPRP "is a greenfield project for most of the project route, which poses uncertainty and risk." *Id.* at 31 (Prepared Testimony of Jason Kalwa at 9). Further, the "in-service date of June 1, 2027" means "an aggressive timeline to execute and complete all construction activities." *Id.* PSEG must also "manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time[,]" as it "will need to obtain ROWs, rights-of-entry, easements, and temporary access agreements, and in these efforts, may encounter local opposition from landowners." *Id.* "To mitigate these risks and challenges," PSEG sought three incentives, including "the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of [its] control." *Id.* at 2.

On August 29, 2024, FERC granted the Petition and issued an Order Granting Petition for Declaratory Order ("FERC Order"). JA1906-1919. FERC found "that the Project faces risks, as discussed by PSEG RT, beyond PSEG RT's control that could lead to the Project's abandonment and that approval of the Abandoned Plant

Incentive will address those risks." JA1912. That finding led FERC to conclude that PSEG can recover "100% of prudently incurred costs expended on or after the date of this Order, if the Project is abandoned for reasons beyond PSEG RT's control." JA1912. PSEG obtained the FERC Order *before* FERC approved the DEA, which occurred on September 10, 2024. JA248.

### III.    The PSC Proceeding

On December 31, 2024, PSEG filed its Application for a CPCN with the PSC. JA064; *see also In re Application of PSEG Renewable Transmission LLC*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024).[4] The CPCN process combines the procedural protections applicable to all PSC proceedings under PU §3-101 *et seq.*, with additional substantive requirements for transmission projects under PU §7-101 *et seq*. PSC proceedings allow for public participation, intervention by interested persons, and the development of a full administrative record.

Upon receipt of PSEG's CPCN Application, the PSC coordinated a multi-agency review, solicited public comments, and provided notice to affected property owners, local governments, and elected officials. PU §7-207(c). Public hearings in each affected jurisdiction will follow. *Id.* at §7-207(d). The PSC will "take final action" on PSEG's CPCN Application "only after due consideration" of, among

---

[4] The Court can take judicial notice of the PSC docket, available at: https://webpscxb.psc.state.md.us/DMS/case/9773 (last visited 9/16/2025).

other factors, the need for the MPRP, alternative routes, and the environmental and land use impacts. *Id.* at §7-207(f)(1). After almost nine months and over 600 filings in the PSC case, the PSC announced days before this brief was due that it will not decide PSEG's case until the spring of 2027, at the earliest.[5]

## IV.    Expedited Proceedings Before the District Court

Rather than working through the PSC process to obtain the power of eminent domain, through its Petition and contemporaneous Motion for Preliminary Injunction, PSEG sought a mandatory injunction to force access to certain private properties along the proposed route of the MPRP.[6] Although Appellants had no opportunity to take discovery or challenge PSEG's unsupported assertions, the district court entered a mandatory Preliminary Injunction on June 20, 2025, and, on July 11, 2025, entered an Amended Preliminary Injunction adding clarifying language and a requirement for security.

The Preliminary Injunction features sweeping provisions, permitting PSEG to "enter" and "remain on" private property owned by Appellants from now until whenever PSEG's CPCN Application "is granted or denied," for the express purpose

---

[5] *See* Order Establishing Procedural Schedule for the MPRP (filed September 11, 2025, PSC Docket No. 639), available at https://webpscxb.psc.state.md.us/DMS/case/9773 (last visited 9/16/2025).

[6] PSEG sued 117 landowners in this action. This computes to 28.6% of all landowners within the proposed right-of-way for the MPRP. JA1940 ("Unique property owners within ROW (count) 409").

of "acquisition and future use of the properties in connection with the Maryland Piedmont Reliability Project." JA2547.

On June 24, 2025, Appellants noted this appeal. JA2523. On July 18, 2025, Appellants filed an amended notice of appeal from the district court's entry of the Amended Preliminary Injunction. JA2549.

## SUMMARY OF ARGUMENT

The district court improperly issued a mandatory preliminary injunction, upsetting the status quo and forcing landowners to give PSEG access to their private properties. The district court provided this disfavored form of relief despite the fact that PSEG does not have pre-condemnation access rights under Section 12-111 of the Real Property Article ("RP §12-111"). Only entities "having the power of eminent domain" can invoke the statutory right of access under RP §12-111(a), and PSEG does not have that power. In fact, whether PSEG ever secures the power of eminent domain hinges on the outcome of the contested PSC proceeding. Ignoring these facts, the district court erroneously concluded that PSEG could invoke RP §12-111 and was likely to succeed on the merits.

The district court also improperly concluded that PSEG would suffer irreparable harm in the form of lost revenue resulting from the lack of access to defendants' properties even though PSEG presented no evidence concerning future lost revenue. Moreover, PSEG's alleged harm will occur irrespective of the

Preliminary Injunction. The evidence demonstrated that, with or without the Preliminary Injunction, PSEG cannot construct the MPRP before the June 2027 deadline imposed by FERC and PJM. Nor can PSEG obtain permission to perform required geotechnical studies on every private property along the proposed MPRP route. Thus, any loss of revenue will be caused by other factors, not by a lack of access. In addition, the harm actually alleged by PSEG in its pleadings – lost development costs – is eligible for complete reimbursement by FERC as part of a generous abandoned plant incentive. JA1912.

The district court next ignored the substantial damage to Appellants, whose property rights will be trampled without even the promise of future just compensation. The district court also discounted the damage caused by forcing Appellants to admit strangers onto their farms, homes and businesses. This led the district court to conclude, incorrectly, that Appellants' harm was outweighed by the non-existent economic harm to PSEG.

Finally, the district court failed to properly consider the public interest in protecting private property rights against private developers who have not yet convinced the PSC to issue a CPCN.

All four factors from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) weigh in favor of Appellants. The Preliminary Injunction should be vacated.

**STANDARD OF REVIEW**

This court reviews the grant or denial of a preliminary injunction for abuse of discretion, but must apply "an exacting standard that demands a clear showing that the necessary criteria have been met," which is even more searching when the district court has issued a mandatory injunction. *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 408 (4th Cir. 2025).

**ARGUMENT**

## I.    The District Court Erred in Entering a Mandatory Preliminary Injunction.

The district court improperly granted a preliminary injunction to upset, rather than preserve, the status quo. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). "The rationale behind a grant of a preliminary injunction has been explained as preserving the *status quo* so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) (emphasis in original); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (defining the status quo in the context of a preliminary injunction as "the last uncontested status between the parties which preceded the controversy").

PSEG did not ask the district court "to maintain the status quo until after a trial and final judgment, which is the traditional function of a preliminary

10

injunction." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). PSEG sought "an order altering the status quo before the case even begins," known as a mandatory injunction. *Id*. Because "mandatory preliminary injunctions alter, rather than preserve, the status quo," are "disfavored," and are "warranted only in the most extraordinary circumstances," reviewing courts apply a heightened standard of review. *Id.*; *see also 2311 Racing*, 139 F.4th at 408 ("'[E]xacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature.'") (quoting *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 525 (4th Cir. 2003) *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).

The "last uncontested status" preceding this lawsuit is not in dispute. No Appellant had consented to PSEG entering their private property for any reason. PSEG cited this lack of consent as the basis for seeking a mandatory injunction to enter and survey Appellants' land. JA098.

The Preliminary Injunction disrupted the status quo. Prior to June 20, 2025, PSEG could not enter Appellants' properties. Now PSEG can.

Equally troubling, the Preliminary Injunction is "largely congruent with the final relief that PSEG seeks through its complaint as final relief." JA2510. In granting the ultimate relief PSEG sought in the form of a preliminary injunction, issued without the benefit of discovery or an evidentiary proceeding during which

11

Appellants could test PSEG's positions and the court could weigh the evidence and make credibility determinations based on a complete factual record, the district court committed reversible error. *See Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of New York,* 544 F.2d 571, 576 (2d Cir. 1976) (preliminary injunction "should not grant relief properly awarded only in a final judgment"); *Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("[A] preliminary injunction should not work to give a party essentially the full relief he seeks on the merits.") (per curiam); *see also Daily Caller v. U.S. Department of State*, 152 F. Supp. 3d 1, 6-7 (D.D.C. 2015). This is particularly true when considering that PSEG did not satisfy the heightened standard for mandatory injunctive relief.

## II.    PSEG Did Not Prove the Four Factors for Injunctive Relief.

In seeking "an extraordinary remedy that should 'be granted only sparingly and in limited circumstances[,]'"*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020), *on reh'g en banc*, 2 F.4th 330 (4th Cir. 2021) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001), PSEG bore the burden of satisfying the "four-factor test from *Winter*." *Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 2313244, at *2 (4th Cir. Aug. 12, 2025). This requires PSEG to show (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the

balance of equities tips in [PSEG's] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

"Part of what makes the four-factor *Winter* test a high bar is its asymmetry. That is, 'a preliminary injunction can be granted only if every factor is met,' '[y]et *denying* a preliminary injunction only takes the rejection of a single factor.'" *Am. Fed'n of Teachers*, 2025 WL 2313244, at *3 (quoting *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023)). Because PSEG did not meet its burden of persuasion on every factor, the district court erred in granting injunctive relief.

1. <u>**PSEG cannot succeed on the merits because it does not have the power of eminent domain.**</u>

PSEG cannot succeed on the merits because PSEG is not an entity "having the power of eminent domain" and is thus not eligible for relief under RP §12-111. Under the plain language of Section 7-207 of the Public Utilities Article ("PU §7-207"), a private transmission line developer only has the power of eminent domain "[o]n issuance of a certificate of public convenience and necessity." PU §7-207(b)(3)(v). PSEG does not have a CPCN, is not an entity "having the power of eminent domain," and has no access rights granted by the statute.

> ### a. Based on the plain language of RP §12-111 and PU §7-207, PSEG has no pre-condemnation access authority.

PSEG sought access to the Respondents' private properties even though it does not have the power of eminent domain. The Maryland statute PSEG sought to invoke is clear, and it does not apply to PSEG:

> Civil engineers, land surveyors, real estate appraisers, and their assistants acting on behalf of the State or of any of its instrumentalities or any body politic or corporate *having the power of eminent domain* after every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry may:
>
> (1) Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;
>
> (2) Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and
>
> (3) Enter on any private land and perform any function necessary to appraise the property.

RP §12-111(a) (emphasis added).

The power of eminent domain is a sovereign power of the State of Maryland wielded by the General Assembly. *King v. Mayor & Council of Rockville*, 52 Md. App. 113, 122 (1982) (power of eminent domain "resides in the Legislature, and may either be exercised by the Legislature or delegated by it to public officers") (quoting

*Rindge Co. v. Los Angeles Cnty.,* 262 U.S. 700, 709 (1923)). An entity cannot have the power of eminent domain unless the legislature has delegated the power.

Neither PSEG nor the district court pointed to a statute in which the General Assembly delegated the power of eminent domain to PSEG. No such statute exists. For a private company seeking to operate an overhead transmission line in Maryland, like PSEG, the only possible source of delegated eminent domain authority is the Maryland statute relating to a CPCN, codified at PU §7-207. The statute, however, grants the power of eminent domain only to those who have been issued a CPCN. Subparagraph (b)(3)(v) provides:

> 1. This subparagraph applies to the construction of an overhead transmission line for which a certificate of public convenience and necessity is required under this section.
>
> 2. *On issuance* of a certificate of public convenience and necessity for the construction of an overhead transmission line, a person may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property or right necessary for the construction or maintenance of the transmission line.

(Emphasis added).

*Only* this subparagraph *grants* eminent domain power. The other subparagraphs of the statute do not contain any such grant. Subparagraph (b)(3)(i) contains a *limit* – not a grant – preventing even those already having the power of eminent domain from exercising that power without a CPCN. Subparagraph

15

(b)(3)(ii) relates to existing transmission lines and is not relevant in this case. Subparagraph (b)(3)(iii) identifies the entities to which the PSC may grant a CPCN and does not mention eminent domain. Subparagraph (b)(3)(iv) relates to limits on the grant of a CPCN in territory served by an electric company and is not relevant in this case. Only subparagraph (b)(3)(v) contains a *grant* of eminent domain power, and that grant is only "[o]n issuance of a [CPCN]."

The fact that subparagraph (b)(3)(v) is the only possible delegation of eminent domain power for a private transmission line developer is confirmed by the legislative history of PU §7-207. Prior to 2015, a CPCN for overhead transmission lines was only available to an electric company, defined as one "who physically transmits or distributes electricity in [Maryland] to a retail electric customer." Md. Code Ann., Pub. Util. §1-101(i). In a 2015 amendment, the General Assembly for the first time permitted private developers to apply for a CPCN, adding the language currently in PU §7-207(b)(3)(iii)(2), which permits applications by an entity that "on the start of commercial operation of the overhead transmission line, will be subject to regulation as a public utility by an officer or an agency of the United States." This amended language, however, *did not grant* the power of eminent domain to these private developers. For that reason, the General Assembly in 2017 found it necessary to amend PU §7-207 again to add the language quoted above in PU §7-207(b)(3)(v).

16

The language of the amended statutory text makes clear that the power of eminent domain is delegated only "[o]n issuance of a [CPCN]." PU §7-207(b)(3)(v).

The district court and PSEG improperly ignored and treated as meaningless both the fact of the 2017 amendment and the statutory text in PU §7-207(b)(3)(v) that was added by the amendment. Not once in the district court's opinion (J2468), PSEG's Petition (JA049) or in any of PSEG's briefing did the district court or PSEG mention the language in PU §7-207(b)(3)(v) that grants eminent domain power "[o]n issuance of a [CPCN]." This Court, however, must not ignore the plain language of the statute. *Moore v. State*, 388 Md. 446, 453 (2005) ("We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory.").

The purpose statement of 2017 Senate Bill 969 confirms that the 2017 amendment to PU §7-207 was passed for "the purpose of authorizing a person to which a certain certificate of public convenience and necessity is issued … to acquire certain property or rights by condemnation." Laws of Maryland, 2017 Ch. 840 (S.B. 969).[7] This statutory authorization would not have been necessary if these entities already had the power of eminent domain.

---

[7] Available at
https://mgaleg.maryland.gov/2017RS/Chapters_noln/CH_840_sb0969e.pdf (last visited 9/16/2025).

The bill file for 2017 Senate Bill 969 further confirms that foreign developers, like PSEG, do not have a pre-existing power of eminent domain in Maryland. The bill file contains comments from the PSC providing its views on what the bill would accomplish. The PSC described the purpose of the bill as follows: "SB 969 would amend the [PU] Article by authorizing a person *who has received* a certificate of public convenience and necessity ('CPCN') from the [PSC] for the construction of a transmission line to acquire condemnation rights in conjunction with that CPCN, subject to Commission approval." JA2125 (emphasis added). The PSC further explained that a previous 2015 amendment expanded the CPCN statute "to apply to persons other than incumbent electric companies." JA2125. According to the PSC, while electric companies already had "underlying condemnation authority granted to them from the State outside of the CPCN statute," entities that were not electric companies "most likely would not have that authority." JA2125 The PSC explained that the 2017 bill "would close the apparent gap in statutory authority from 2015 by allowing the [PSC] *to grant* the right of condemnation to a person *who has obtained* a CPCN for the construction of an overhead transmission line," and that "[i]f the [PSC] decided to grant such rights, the [PSC] would grant them *in conjunction with* the underlying CPCN." JA2126 (emphasis added). Thus, the PSC viewed the 2017 amendment as giving the PSC the authority to grant the power of eminent domain at the same time that it issued the CPCN, not before and not after.

18

The *issuance* of the CPCN, therefore, is not one of numerous "conditions precedent" to exercising some pre-existent power of eminent domain, as PSEG has argued. Rather, the issuance of the CPCN *is* the event, designated by the General Assembly, upon which the power of eminent domain is granted in the first instance. Prior to the issuance of a CPCN, a private transmission line developer has no power of eminent domain. PSEG has repeatedly asserted that it had some pre-existing power of eminent domain, but has never pointed to *any* statute in which the General Assembly granted that right. The fact is that neither PU §7-207 nor any other law provides eminent domain power to a private entity for the construction of overhead transmission lines *prior to* the issuance of a CPCN. PSEG has not been issued a CPCN and, therefore, has no power of eminent domain under Maryland law.

> **b. *PPRP's asserted need for information does not justify extending RP §12-111 to entities that do not have the power of eminent domain.***

PSEG also has argued that, because Md. Code, Nat. Res. ("NR") §3-306 requires the Power Plant Research Program ("PPRP") to complete certain assessments during the CPCN review process, RP §12-111 must be interpreted to permit PSEG to gather all information required for those assessments before a CPCN is issued.[8] PSEG's interpretation hinges entirely on its assertion that the statutes,

---

[8] And yet PSEG has conceded that RP §12-111 does not permit collection of all information necessary for PPRP's assessments. JA1849 ("Any surveys that involve invasive activities [such as geotechnical surveys] on private property are not legally authorized prior to the issuance of a CPCN without the express approval of the

when interpreted based on the ordinary meaning of the words used, would be "unworkable." This argument presumes that the law requires PSEG to provide certain information to PPRP and that PPRP has no other mechanism to obtain this information during the CPCN application process.

PSEG's presumption, however, is false as a matter of law. The General Assembly has authorized PPRP to gather the information it needs to accomplish the required analysis. In 1984, the General Assembly amended Title 3, Subtitle 3 of the Natural Resources Article – the subtitle that governs PPRP – to give PPRP all the access rights that might be necessary to perform its responsibilities. Laws of

---

property owner."). In *Mackie v. Mayor and Com'rs of Town of Elkton,* 265 Md. 410 (1972), the Court held that RP §12-111 does not extend to the geotechnical studies requested by PPRP, or any other invasive studies. In the more than fifty years since *Mackie* was decided, the General Assembly has not amended RP §12-111(a) to permit invasive surveys. If there was an intent for RP §12-111(a) to apply necessarily to all instances in which PPRP required information, the General Assembly certainly would have amended the statute to permit invasive surveys. The General Assembly did amend RP §12-111 to provide special rights to the State Highway Administration ("SHA") and the Maryland Transit Authority ("MTA"), by adding subsection (g) in a 1981 amendment. Laws of Maryland, 1981, Ch. 520 (S.B. 215), available at: https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000741/html/am741--2142.html (last visited 9/16/2025). In contrast to subsection (a), which does not permit soil boring and excavation, subsection (g) permits SHA, MTA and their "consultants" to "enter upon private property to conduct environmental and engineering studies, including soil boring and excavation." PSEG, of course, is not part of SHA or MTA.

Maryland, 1984, Ch. 601 (H.B. 250).[9] The amendment added NR §3-305(f), which gives "the [Department of Natural Resources ('DNR')], its agents, employees, and contractors" the right to "enter upon private property to collect data and otherwise conduct environmental and engineering studies related to … potential overhead transmission lines in excess of 69,000 volts," including "the installation of meteorological testing equipment, biological sampling, soil borings, and installation of test wells." An "electric company" may make a "written request" to DNR "setting out the nature, extent, and duration of the work to be done," but only the DNR may conduct the studies. *Id.* In no event does NR §3-305(f) extend to private transmission line developers independently accessing private property. Nevertheless, in this provision, the General Assembly provided a specific mechanism for DNR and PPRP to obtain the information they need to perform their duties under NR §3-306, as well as the limits of that mechanism. The issue is not that the information cannot be gathered, as PSEG has argued, but that PSEG is dissatisfied with the mechanism that was provided by the General Assembly.

The district court improperly stretched RP §12-111 to solve a supposed problem that the General Assembly addressed many years ago. To the extent PPRP

---

[9] Available at
https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000759/html/am759--3070.html (last visited 9/16/2025).

has been unwilling to gather the information, PSEG can raise that issue with PPRP or with the PSC. But there is no legitimate reason to distort RP §12-111 based on the inaccurate assumption that the legislative framework does not provide a mechanism to gather the information.

      c. *Principles of statutory construction dictate that RP §12-111 may not be invoked by an entity that does not have the power of eminent domain, regardless of an asserted need to access properties.*

PSEG has urged a harmonized reading of NR §3-306, PU §7-207, and RP §12-111, but the plain language and the history of the adoption of these statutes suggests a different harmony than what PSEG suggests. First, under well-established principles of statutory construction, "[w]hen the statutory language is clear, [a court] need not look beyond the statutory language to determine the Legislature's intent. *Scriber v. State*, 437 Md. 399, 410 (2014) (quoting *Stoddard v. State*, 395 Md. 653, 661 (2006)). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, [the court] will give effect to the statute as it is written." *Id*.

The language from RP §12-111(a) – "having the power of eminent domain" – grammatically is a *present* participle, the common and everyday meaning of which is that the entity must have the power of eminent domain in the present. It cannot mean "does not have" or "might someday have," which is the effect of the district court's decision. The language from PU §7-207(b)(3)(v) – "[o]n issuance of a

22

[CPCN]" – has the common and everyday meaning that the right to acquire property by condemnation is granted at the time the CPCN is issued, not before. It cannot mean "before issuance," but again that is the effect of the district court's decision. The plain language is clear and the inquiry should end. PSEG has not been issued a CPCN, does not have the power of eminent domain, and cannot invoke the access rights enumerated in RP §12-111.

Even if the language was not clear, the histories of NR §3-306, PU §7-207, and RP §12-111 also indicate that RP §12-111 is limited to entities that already have the power of eminent domain. RP §12-111 has only ever applied to governmental and other entities already having the power of eminent domain. The relevant language in RP §12-111(a) is substantially unchanged since 1963. *Mackie*, 265 Md. at 413 (quoting substantially identical language and noting that it was enacted in 1963). When the General Assembly created PPRP and tasked PPRP with performing an assessment in connection with a CPCN application, it did not amend RP §12-111. In 1984, the General Assembly gave PPRP express authority to access private property to gather information in support of this assessment but made no amendments to RP §12-111 to give this authority to private entities. Laws of Maryland, 1984, Ch. 601 (H.B. 250); NR §3-305(f). Likewise, when the General Assembly expanded development of electric transmission lines to out of state developers, it expressly provided that such developers would have the power of

23

eminent domain only "[o]n issuance" of a CPCN. PU §7-207(b)(3)(v). The General Assembly made no amendments to RP §12-111 to provide out-of-state developers with access rights *before* issuance of a CPCN.

Nothing in the text or legislative history of NR §3-306, PU §7-207, and RP §12-111 supports the notion that the General Assembly intended to provide access rights to entities that had not been issued a CPCN. Indeed, the statutory language suggests that the General Assembly made a deliberate legislative decision to balance private property rights against the State's interests in public utility projects by requiring a CPCN *before* an entity could access private property. Unless and until the private entity receives a CPCN from the PSC, the private entity is essentially a stranger to the State of Maryland and is not vested with any authority to act on the State's behalf. It was not unreasonable for the General Assembly to tie the power of eminent domain to the PSC's decision to issue a CPCN. Nor was it unreasonable in 1963 (or at any time since) for the General Assembly to limit the applicability of RP §12-111 to entities "having the power of eminent domain."

Even if the failure to provide access rights to such entities prior to a CPCN is perceived as an omission from the statute, a court is not permitted to fill the perceived gap. Maryland's highest court has explained: "Even though a certain provision, which has been omitted from a statute, appears to be within the obvious purpose or plan of the statute, and to have been omitted merely by inadvertence,

24

nevertheless, the court is not at liberty to add to the language of the law; and the court must hold that the Legislature intended to omit the provision, however improbable that may appear in connection with the general policy of the statute." *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins*, *LLC*, 412 Md. 308, 327 (2010) (quoting *Rogan v. B & O R. Co*., 188 Md. 44, 54 (1947)). Similarly, the United States Supreme Court has explained: "If courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to 'tak[e] ... account of' legislative compromises essential to a law's passage and, in that way, thwart rather than honor 'the effectuation of congressional intent.'" *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120-21 (2019) (quoting *Board of Governors, FRS v. Dimension Financial Corp*., 474 U.S. 361, 374 (1986)). Under both Maryland and federal law, PSEG cannot appeal to policy, divorced from the actual text of RP §12-111. As the court in *Rosemann* noted, "[i]f the situation brought to light by this case is an oversight, it is a matter for the Legislature to correct," not the Court. *Rosemann*, 412 Md. at 327.

Finally, the longstanding principle that "statutes of eminent domain are to be strictly construed" applies to RP §12-111. *Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 166 Md. 118, 170 A. 590, 591 (1934). The district court erroneously brushed aside this principle by claiming that RP §12-111 is only about access and not about eminent domain. JA2498. The district court ignored the plain fact that RP §12-111

is part of the 1963 recodification entitled "Eminent Domain," and therefore is a statute of eminent domain. Report of the Legislative Council Committee to Revise the Condemnation Laws of Maryland, November 14, 1962 at 288.[10] Access and eminent domain are inextricably linked by the express language of the statute, which provides pre-condemnation access only to those entities "having the power of eminent domain." RP §12-111(a). Maryland courts have held that "[t]he right to enter property pursuant to §12-111 is a 'key element' in the exercise of the power of eminent domain." *King*, 52 Md. App. at 122. This statute, like all statutes of eminent domain, must be strictly construed rather than stretched to conform to some conception of what the General Assembly must have intended.

What the General Assembly intended is clear from the language of the statutes themselves. Access rights under RP §12-111(a) are available only to those entities "having the power of eminent domain." Under the Public Utilities Article, an electric transmission line developer has the power of eminent domain only "[o]n issuance of a [CPCN]." PU §7-207(b)(3)(v). To the extent PPRP needs access to fulfil its responsibilities, the General Assembly has provided PPRP with such access rights, but these rights do not extend to private entities. NR §3-305(f). The district court

---

[10]  Available at https://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=13172 (last visited 9/16/2025) at 270-307.

failed to give effect to the plain meaning of these statutes and wrongfully determined that PSEG was likely to succeed on the merits.

> ### d. The reference to future public use in RP §12-111 does not indicate that PSEG has the power of eminent domain.

The district court asserted that the statute must extend to entities who do not currently have the power of eminent domain based on the fact that RP §12-111 permits surveys to "obtain information relating to the acquisition or future public use of the property." JA2494. The court asserted that requiring PSEG to have already been granted the power of eminent domain would "render meaningless the reference to obtaining information for a future acquisition or future public use of the property." *Id*. This reasoning, however, ignores that the statute has always been used by governmental and other entities that *already* had the power of eminent domain, and thus could have begun actual condemnation proceedings. These entities routinely use RP §12-111 to explore the possibility of future acquisition for future projects they could lawfully construct. The fact that the statute permits explorations linked to future projects is irrelevant to the threshold question of whether the entity seeking to invoke the statute has the power of eminent domain.

The district court suggested that the General Assembly could not possibly have intended to make an entity wait for access rights until it "could begin actual condemnation proceedings." JA2498. But that is precisely the normal state of affairs for entities that have used the statute for more than a hundred years, since what is

now RP §12-111 was first enacted in 1916. Laws of Maryland, 1916 Ch. 649.[11] From the beginning, the statute was designed to allow Maryland governmental entities, which already had the power of eminent domain, to make surveys to assess proposed (that is, future) public works projects. *Id*.

In 1963, more than fifty years before private transmission line developers were permitted to operate in Maryland, the statute that is now RP §12-111 was amended as part of a recodification of Maryland's eminent domain law. *See* Laws of Maryland, 1963 Ch. 52.[12] The 1963 amendment extended the statute beyond governmental entities, to cover "any body politic or corporate having the power of eminent domain." *Id*. at 85. This amendment contained the language that is still in effect in RP §12-111 and gave entities "having the power of eminent domain" the right to make surveys "relating to the acquisition or future public use of the property or for any governmental report, undertaking or improvement." This same language applied to and has been used repeatedly by numerous governmental and other entities *already* having the power of eminent domain. For example, the statute has been used by SHA to evaluate various proposed roadway projects. Critically, SHA

---

[11] Available at
https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000534/html/am534--1332.html (last visited 9/16/2025).

[12] Available at
https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000671/html/am671--80.html (last visited 9/16/2025).

already had the power of eminent domain *before* it invoked RP §12-111. The statute certainly was not rendered meaningless by the requirement that an entity must have the power of eminent domain in order to pursue pre-condemnation access.

There is no evidence to support the assertion that the General Assembly did not intend exactly what the plain language of the statute indicates – that it applies to entities "having the power of eminent domain." The district court's interpretation renders these words meaningless because it extends RP §12-111 to entities that *do not have* and *may never have* the power of eminent domain.

### e. PSEG is not an agent of PPRP, DNR, or any other State agency.

The district court also based its ruling on an alternative but erroneous assertion that PSEG has been "acting on behalf of" PPRP as those words are used in RP §12-111(a). The court asserted that legal principles of agency are "beside the point for purposes of interpreting §12-111," without citation to legal authority and without identifying any alternative legal principles that should have been applied to interpret the words "acting on behalf of." JA2495.

As a matter of law, PSEG was not "acting on behalf of" PPRP. PSEG had cited *Broadway Servs., Inc. v. Comptroller of Maryland*, 478 Md. 200 (2022) to suggest that it was acting as an implicit agent of PPRP. But there are no facts or allegations to support the contention that PSEG is acting as an implicit agent of DNR or PPRP in seeking access. *See, e.g., id.* at 216 (implicit agency requires court to examine

29

three factors: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent."). None of these factors exist here: PSEG cannot alter DNR's legal relations, PSEG is not acting primarily for the benefit of DNR, and DNR is not controlling PSEG.

Finally, holding that PSEG was "acting on behalf of" PPRP would make PPRP liable under RP §12-111(c) for damages caused by PSEG in conducting the surveys. RP §12-111(c) imposes liability on the entity on whose behalf the engineer or surveyor is acting; if the engineer or surveyor is deemed to be acting on behalf of PPRP, as suggested by the district court, then PPRP would be liable for damages. There is no indication in the text of RP §12-111 or any of the statutory history that the General Assembly intended to make PPRP liable for the actions of private entities simply because PPRP asked those entities to collect information for analysis, yet that is the result of the district court's holding.

### f. *Federal law cannot give PSEG the power of eminent domain.*

The district court asserted that PSEG was somehow already an entity "having the power of eminent domain" because PJM selected PSEG to build the project and FERC accepted the DEA between PJM and PSEG, without providing any logical connection, because there is none. JA2596-2497. Neither the potential but uncertain future regulation by FERC nor the approvals already received from PJM and FERC

30

are sufficient to grant the power of eminent domain to PSEG. PSEG's DEA (JA157), PJM's submission to FERC for approval of the DEA (JA184), and the FERC order approving filing of the DEA (JA248) do not even mention eminent domain.

Nor could PJM or FERC confer upon PSEG *Maryland's* power of eminent domain. Federal regulation of interstate transmission and sale of electric energy for ultimate distribution to the public should "extend only to those matters which are not subject to regulation by the States." 16 U.S.C. §824(a). *See also* FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) at ¶107 (Acknowledging "longstanding state authority" over "matters relevant to siting, permitting, and construction" of transmission lines, and explaining that rule "in no way involves an exercise of authority over those specific substantive matters traditionally reserved to the states, including… authority over such transmission facilities."). Thus, for an electric transmission line, the power of eminent domain must come from the State of Maryland, not from FERC or any other federal source.[13] PJM contracts and FERC approvals, therefore, cannot and do not establish that PSEG has the power of eminent domain delegated by the State of Maryland.

---

[13] The only instance under the Federal Power Act in which there is federal eminent domain authority for a transmission line relates to a designated "national interest electric transmission corridor," which requires a substantially separate process and does not apply in this case. 16 U.S.C. §824p.

Nor does any Maryland statute confer eminent domain authority based upon selection by PJM or approvals by FERC. PU §7-207(b)(3)(iii)(2) permits the PSC to issue a CPCN to an entity that "on the start of commercial operation of the overhead transmission line, will be subject to regulation as a public utility by an officer or an agency of the United States." But the *grant* of eminent domain power under the statute occurs only "[o]n issuance of a [CPCN]," as expressly stated in PU §7-207(b)(3)(v). As noted above, in 2017, the General Assembly recognized that the language in §7-207(b)(3)(iii)(2) concerning future federal regulation *did not grant* eminent domain power, and therefore added the language of §7-207(b)(3)(v). *See* Laws of Maryland, 2017 Ch. 840 (S.B. 969) (passed for "the purpose of authorizing a person to which a certain [CPCN] is issued … to acquire certain property or rights by condemnation"). The plain text of the statute and its legislative history conclusively demonstrate that the *only* delegation of eminent domain authority by the General Assembly to a transmission line developer is contained in §7-207(b)(3)(v), and it occurs "[o]n issuance of a [CPCN]." FERC cannot grant Maryland's eminent domain power, and the Maryland General Assembly has not tied the delegation of such power to FERC approvals, but rather to the issuance of a CPCN.

> ### g. *The Maryland Circuit Court opinion in Transource does not support PSEG's interpretation.*

The opinion of the Circuit Court for Harford County in *Transource Maryland, LLC v. Scott* (JA1735) is not persuasive and cannot override the plain language of PU §7-207 and RP §12-111. In the opinion, then Judge Eaves appears to have determined that Transource already had the power of eminent domain because it was "an entity that is a public service utility." JA1741. It appears that the judge determined that Transource was a "public utility" by incorrectly assuming that Transource was an "electric company" under Section 1-101 of the Public Utilities Article. JA1741. In the Public Utilities Article, "'Electric company' means a person who physically transmits or distributes electricity in the State to a retail electric customer." Md. Code, Pub. Util. §1-101(i)(1). PSEG does not transmit or distribute electricity in Maryland to retail electric customers. Therefore, PSEG could not have survived the first part of Judge Eaves' two-part analysis. JA1741.

Starting with the incorrect assumption that Transource was an electric company already having the power of eminent domain, the Maryland circuit court decided that Transource could invoke RP §12-111. Here, PSEG is not an electric company, does not have the power of eminent domain, and cannot invoke RP §12-111. The circuit court's analysis concerning timing of access is not persuasive because that analysis cannot create a power of eminent domain here, where PSEG does not already have that power.

33

2. _The district court erred in concluding that PSEG would suffer irreparable economic harm absent injunctive relief._

Despite there being no possibility that PSEG will ever meet the June 2027 in-service deadline for the MPRP for reasons unrelated to this case, the district court improperly concluded that PSEG would somehow suffer irreparable economic harm if it was not given immediate access to private properties. This conclusion is untethered from the record. PSEG's alleged harm is unrelated to the claims it asserted in this case.

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" _Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell_, 915 F.3d 197, 216 (4th Cir. 2019) (quoting _Direx Israel, Ltd. v. Breakthrough Med. Corp._, 952 F.2d 802, 812 (4th Cir. 1991)). The mere "possibility" of harm is not enough. _Winter_, 555 U.S. at 22. Moreover, a "preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." _Id._ (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 154 (2d ed.1995)).

In concluding that PSEG cleared this high bar, the district court accepted the premise that "PSEG has shown that the project could be substantially delayed in the absence of an injunction," holding PSEG "likely will suffer substantial monetary harm from anticipated future financial losses (such as loss of revenue) as a result of

34

the delay." JA2516. This decision rests on two critical assumptions: *first*, that the PSC will grant PSEG's CPCN Application, and *second*, that, with an injunction, PSEG will be able to construct the MPRP and put it into service by June 1, 2027. Neither is certain to occur.

"The very function served by requiring a 'clear showing of irreparable harm' that must be 'actual and imminent' rather than 'remote [and] speculative,' is to limit the deployment of the heavy artillery of preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent a harm from occurring." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2003) *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). "When the court concludes that it is impossible to ascertain *when* such tipping might occur and that it cannot say with confidence that the harm is more likely than not to occur *at all*, the proper conclusion to draw is that the plaintiff has failed to make the clear showing required." *Id.* (emphasis in original).

According to the district court, absent a preliminary injunction permitting PSEG to conduct the PPRP-recommended surveys, "PSEG is likely to lose any revenue it would otherwise have received had PSEG been able to meet the June 1, 2027 in-service deadline." JA2515-2516. But the evidence before the district court demonstrated that PSEG cannot meet the in-service date under any circumstance. Multiple events independent of this litigation stand in PSEG's way. JA2284-2288.

35

First, PSEG cannot build the project at all, much less meet the deadline, unless the PSC grants PSEG's CPCN Application. Without a CPCN from the PSC, PSEG cannot "begin construction" of the MPRP or "exercise a right of condemnation with the construction." PU §7-207(b)(3)(i). The disputed proceeding before the PSC is ongoing and will not reach a conclusion until at least spring of 2027.

Second, even if PSEG were eventually to obtain a CPCN, it is virtually certain that the PSC will not grant it in time for PSEG to meet the aggressive deadline of June 1, 2027 for putting the MPRP in service. This fact negates PSEG's alleged irreparable harm because such harm will not be prevented by the Preliminary Injunction. *See, e.g., S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.,* 696 F.3d 771, 779 (8th Cir. 2012) (preliminary injunction issued too late in semester "could not prevent any potential harm resulting from the [students'] loss of honors credit").

 The PSC case has been pending for almost nine months (filed on December 31, 2024). While COMAR 20.79.01.07 imposes a one-year deadline for decisions on electric generating station CPCN applications, there is no equivalent deadline for the PSC to take action on transmission line applications, as here. When the district court made its decision, the date by which the PSC would rule was uncertain, but it was highly unlikely any ruling would issue in time for PSEG to meet the June 2027 in-service deadline. Then, just days before this brief was due, the PSC issued an Order Establishing Procedural Schedule for the MPRP (filed September 11, 2025,

PSC Docket No. 639) ("Scheduling Order"). The final date in the Scheduling Order is February 12, 2027, and a decision will follow sometime thereafter, thereby making it impossible for PSEG to meet the June 2027 in-service deadline.

From the beginning, PSEG recognized that "the project route" itself "poses uncertainty and risk." *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024), at 31 (Prepared Testimony of Jason Kalwa at 9).[14] PSEG further explained that "an in-service date of June 1, 2027," portends "an aggressive timeline to execute and complete all construction activities." *Id*.

In an effort to accommodate this aggressive timeline, PSEG, in March 2025, proposed a schedule to the PSC that might have allowed the PSC to rule on the CPCN Application by January 2026. JA1841, JA2069. PSEG has persistently maintained: "To meet the June 1, 2027 in service deadline, the Company must begin constructing the MPRP by January 2026." JA0064, JA1829, JA1860 (PSC filings).

PPRP filed a response to the proposed schedule in the PSC proceeding on April 11, 2025, in which it "strongly object[ed] to PSEG's unrealistically optimistic procedural schedule set forth in its Motion." JA2072. PPRP further called PSEG's

---

[14] PSEG's FERC filing is available at
https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240415-5328 (last visited 9/16/2025).

schedule "implausible" (JA2074) and noted that the PSC took approximately 30 months to review the only other project "sufficiently comparable to the subject case to provide practical insight as to the time necessary to review the MPRP" (JA2075-2076). A 30-month schedule would mean the PSC would not even rule on PSEG's December 31, 2024 Application until June 2027 at the earliest, leaving PSEG no time to construct the project before the June 2027 in-service deadline. In a later filing on May 8, 2025, PPRP referred to PSEG's notion that the entire PSC case could be completed in a year as "nonsensical." JA2324.

On September 11, 2025, the PSC issued the Scheduling Order, agreeing with PPRP's assessment that PSEG's proposed schedule was implausible and would not permit the PSC to perform the "required statutory public interest review under" PU §7-207. *See* Scheduling Order at 6. The PSC held that despite the deadlines set by PJM, the PSC "cannot compromise PPRP's ability to conduct its review of the Application." *Id*. The PSC further noted that allowing PSEG's in-service deadline "to dictate the procedural schedule would require the [PSC] to accept the broad outlines of this case, as presented by the Applicant, without any real inquiry or the input of PPRP and the other parties," and would force the PSC "to accept the premise that denial of a CPCN will result in electric blackouts for certain Maryland customers without any examination of whether that would actually be the case." *Id*. The PSC therefore adopted a schedule with evidentiary hearings in December 2026, and post-

38

hearing briefing to be concluded by February 2027. *Id.* at 7. Under this schedule, there is no possibility that PSEG will meet the June 2027 in-service deadline. JA0064 (PSEG asserting it "must begin" construction "by January 2026" to meet the in-service deadline).

From the outset, it was implausible that PSEG could have built a 67-mile transmission line across Maryland in less than eighteen months even under ideal circumstances. As with every construction project, a host of factors may cause delays, including labor shortages, challenges with the procurement of material, and legal obstacles. Even now, there are still 91 landowners along the proposed route that have not been party to any lawsuit seeking access; PSEG still needs to negotiate or initiate litigation to force access to those properties.[15]

In addition, in order to provide PPRP with invasive geotechnical surveys "for the entirety of the Project ROW" (JA258), PSEG has always needed to negotiate access with each of the landowners, including Appellants. PSEG has conceded that "[a]ny surveys that involve invasive activities [such as geotechnical surveys] on private property are not legally authorized prior to the issuance of a CPCN without

---

[15] On July 15, 2025, PSEG sued an additional 201 landowners. *See PSEG Renewable Transmission LLC v. Alvi Properties, LLC, et al.*, Case No. 1:25-cv-02296-ABA (D. Md.). Between that lawsuit and this one, PSEG has targeted 318 landowners or 77.75% of those within the proposed right-of-way for the MPRP. JA1940 ("Unique property owners within ROW (count) 409").

the express approval of the property owner." JA1849. There was no evidence presented to the district court that any landowners had agreed to such access.

PSEG's potential economic injury is "conditioned on possible future events," *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991), any one of which will frustrate PSEG's ability to put the MPRP in service by June 1, 2027. Beyond the inordinate risk of meeting an aggressive construction schedule, PSEG confronts uncertainty at the PSC, as well as uncertainty around mass land acquisition, unfiled litigation, and surveying needs. Each uncertainty may prevent the MPRP from going into service, in mid-2027 or ever, irrespective of what happens in this case. JA2285-2286. That may be "problematic" for PSEG, but it is not enough to warrant injunctive relief. *Direx Israel, Ltd.*, 952 F.2d at 816. PSEG cannot establish that a preliminary injunction, standing alone, will avert its alleged harm. *See, e.g., Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*, 635 F. Supp. 3d 392, 403 (D. Md. 2022) ("the mere possibility of irreparable harm in the absence of the requested relief is not sufficient to support the issuance of a preliminary injunction"); *SH Franchising, LLC v. Newlands Homecare, LLC*, No. CV CCB-18-2104, 2019 WL 356658, *5 (D. Md. Jan. 29, 2019) (because movant was "not suffering actual and imminent harm and instead has shown only the mere possibility of future harm," movant could not establish a likelihood of "irreparable harm absent a preliminary injunction").

Moreover, economic losses generally do not constitute irreparable harm. *Hughes Network Sys., Inc. v. InterDigital Communications Corp*., 17 F.3d 691, 694 (4th Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date…weighs heavily against a claim of irreparable harm.") (internal citations omitted); *see also Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006). Even if this were a rare case in which monetary damage alone could constitute irreparable injury, PSEG is not likely to incur any economic losses under any circumstance.

Despite holding that PSEG "has shown irreparable harm sufficient to justify issuance of a preliminary injunction, specifically in the form of lost revenues that PSEG would incur in the absence of an injunction" (JA2515), the district court cited no evidence of PSEG's potential lost revenues because PSEG never presented any such evidence. JA2515 (citing PSEG's unsupported allegation of "monetary harm if its construction of the MPRP is delayed"). The only record of potential economic harm to PSEG is a recitation of the total amount allegedly spent on siting and

41

environmental consultants as well as real estate attorneys (JA151), all of which are eligible for full recovery under the FERC Order (JA2251-2255).[16]

Had PSEG presented evidence of projected lost revenues for its unapproved transmission line, those projections would be inherently speculative. *See, e.g., Coastland Corp. v. Third Nat. Mortg. Co.*, 611 F.2d 969, 977 (4th Cir. 1979) (analyzing lost profits claim for new business and observing that "such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages") (internal citations omitted). It is also speculation to conclude that a preliminary injunction will abate projected losses. A host of issues unrelated to PSEG's claim make it equally plausible that the MPRP and PSEG's potential revenue therefrom might never materialize.

Sidestepping these arguments, the district court placed great emphasis on *Mountain Valley*, *supra*, and *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th

---

[16] By its express terms, the FERC Order authorizes 100% recovery of prudently incurred costs if the MPRP is abandoned and eliminates any risk that PSEG will suffer irreparable economic harm. JA2253. The Abandoned Plant Incentive ensures that PSEG "will recover every dollar it invests on a cost basis so long as the investment can be justified as prudently incurred in furtherance of, and consistent with, the planning, design, permitting, siting, and construction of the" MPRP. JA2253. Indeed, FERC determines whether costs were prudently incurred and applies a presumption of prudence. *Potomac-Appalachian Transmission Highline, LLC & PJM Interconnection, L.L.C.*, 152 FERC ¶63,025, 66,165 at P 73 (2015).

Cir. 2004). JA2513-2515. Neither case supports the district court's decision here. In *Mountain Valley* and *Sage*, natural gas companies, having already received CPCNs from FERC under the NGA, brought condemnation proceedings against landowners in the path of the pipeline project. Unlike this case, the landowners conceded that the gas companies had the right to take land by eminent domain. *Mountain Valley*, 915 F.3d at 216 ("There is no question, then, that Mountain Valley may take easements across the properties at issue, making this the rare preliminary-injunction case in which success on the merits is guaranteed."); *Sage*, 361 F.3d at 829-30 ("ETNG has a determination on the merits that it has a right to condemn the landowners' property, and the landowners now concede that ETNG possesses this right. Success on the merits for ETNG is therefore apparent.").

In the condemnation proceedings, the district courts granted immediate possession of the properties only after first determining that the gas companies already had a CPCN giving them the right to condemn the properties. *Mountain Valley*, 915 F.3d at 215; *Sage*, 361 F.3d at 828. The court reserved the issue of the amount of just compensation for later in the case, but required the natural gas companies to pay into court the estimated just compensation for the takings, which the landowners could begin drawing upon immediately. *Mountain Valley*, 915 F.3d at 209; *Sage*, 361 F.3d at 820.

43

After acknowledging that "*Mountain Valley* and *Sage* are distinguishable" factually and substantively (JA2514), the district court concluded that PSEG's "prospective financial losses" qualified as irreparable injury much like "'prospective economic injuries flowing from a delay in pipeline construction' qualified as irreparable injury" in *Mountain Valley* and *Sage*. JA2515. This conclusion ignored *the* dispositive fact. In *Mountain Valley* and *Sage*, the petitioners had a CPCN and thus a clear path to construct a natural gas pipeline and generate revenue well within the projected timeline. Here, it is unknown whether PSEG will secure a CPCN, then successfully build the MPRP, and then generate revenue from it. Statistically speaking, the probability of PSEG running the table is low. *Cf Am. Fed'n of Teachers*, 2025 WL 2313244, at *3, n. 4 (recognizing likelihood of success reduces when plaintiff must prevail on multiple issues).

In summary, PSEG's "anticipated future financial losses" (JA2516) fall well short of irreparable injury. PSEG did not prove "a present or immediate need for preliminary relief." *Direx Israel, Ltd.*, 952 F.2d at 816. "Remembering that preliminary injunctions are 'extraordinary remedies' involving the exercise of 'very far-reaching power' to be granted only 'sparingly' and 'in limited circumstances,' the grant of such relief in this case, where the harm" to PSEG is "not present or immediate but merely problematic, conditioned on possible future events, would

44

seem contrary to" the Fourth Circuit's "stated rule: A plaintiff, seeking preliminary relief, must show the present threat of irreparable harm." *Id.*

### 3. *The balance of equities did not favor injunctive relief.*

In contrast to the lack of irreparable harm demonstrated by PSEG, Appellants will suffer significant injury from being forced, under court order, to permit access to their homes, farms and businesses. When considering a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations omitted). Here, the balance of equities tips decisively against injunctive relief because Appellants face far greater harm under the Preliminary Injunction than PSEG would suffer if the injunction were vacated.

The district court echoed the reasoning of *Mountain Valley* when it asserted that "the harms that Defendants allege they will suffer would be a result of the construction of the transmission line itself (for which any affected property owners would receive just compensation)." JA2517. *See Mountain Valley*, 915 F.3d at 220 ("those injuries arise not from the grant of preliminary relief – the 'take-first, pay-later' condemnations to which the Landowners object – but from construction of the pipeline itself"). As noted above, however, this case is not the same as *Mountain Valley*, and the contrast demonstrates how the balance of equities tips in favor of Appellants.

In *Mountain Valley*, the natural gas company had already obtained a CPCN and had already initiated condemnation proceedings against the landowners, ensuring that they would receive just compensation. *Id*. The landowners were further protected by their right "to draw upon court-ordered deposits during the pendency of condemnation proceedings." *Id*. Here, PSEG has not and cannot initiate condemnation proceedings and has offered Appellants *nothing* as compensation for the invasion of their property rights. Moreover, the district court's Preliminary Injunction authorizes PSEG to immediately enter Appellants' private properties "to make surveys, run lines or levels, or obtain information" from now until the CPCN Application "is granted or denied," all without compensation or even the promise of future compensation. JA2547. This multi-year encumbrance is for the specific purpose of "acquisition and future use of the properties in connection with the" MPRP. JA2547.

Objectively, the Preliminary Injunction burdens every Appellant's property with a court-ordered right of entry under the auspice that PSEG *might* exercise eminent domain in the future. This imposition interferes with Appellants' right to fully and freely use and enjoy their properties. It also depresses the value of all affected properties and destroys their marketability. Thus, the Preliminary Injunction qualifies as a temporary taking, yet the district court did not require PSEG to pay just compensation (or any compensation) to Appellants.

46

"The right to exclude is 'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). "Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation." *Id.* at 150. After analyzing the relevant precedent on this topic, the *Cedar Point* Court observed:

> The upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation. As in those cases, the government here has appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year. The regulation appropriates a right to physically invade the growers' property—to literally "take access," as the regulation provides. Cal. Code Regs., tit. 8, §20900(e)(1)(C). It is therefore a *per se* physical taking under our precedents.

*Id.* at 152.

So long as the Preliminary Injunction remains in place, PSEG has the legal right to "physically invade" Appellants' land for the purpose of completing studies anywhere and everywhere on that land until the PSC process concludes. If any Appellant wished to sell their property, the seller would convey title subject to PSEG's "acquisition and future use" of said property for the MPRP. This is a cloud

47

on title to Appellants' properties. *See Sokel v. Nickoli*, 97 N.W.2d 1, 5 (Mich. 1959) ("the notice of proposed taking by eminent domain creates a cloud which prevents the plaintiffs from selling their property or otherwise using it without hindrance").

In Maryland, "the Legislature intended to compensate property owners for a wide range of detrimental effects that the exercise (or threatened exercise) of eminent domain might have," including any "diminution in value" caused by an actual or threatened condemnation. *Reichs Ford Rd. Joint Venture v. State Roads Comm'n of the State Highway Admin.*, 388 Md. 500, 520-21 (2005). Applied here, no prudent buyer would purchase property under cloud of condemnation without receiving a considerable discount from market value, if at all. Worse, the cloud on title to Appellants' properties does not benefit a party with the present right to acquire property by eminent domain, but instead an out-of-state entity that admittedly has no present authority to condemn private property.

The duty to pay just compensation when taking private property for public use is a bedrock principle of state and federal law. Md. Const. Art. III, §40; U.S. Const. Amend. V, cl. 4. When a condemnor "physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). This duty applies equally to both

temporary and permanent takings. *Ark. Game & Fish Comm'n v. U.S.,* 568 U.S. 23, 32-33 (2012).

*J.L. Matthews, Inc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 368 Md. 71 (2002), is instructive. The Supreme Court of Maryland recognized that, until a condemnor actually takes property, the "owner is free to use the property as he, she, or it normally would[.]" *Id.* at 104 n. 28. "By obtaining an injunction in this case, however," the condemnor "artificially set the fair market value of the Property as of the date of the injunction. That act is in total contravention of the tenets of established condemnation law." *Id.*

Here, the Preliminary Injunction put the world on notice that Appellants' properties are subject to "acquisition and future use" for the MPRP. JA2547. This open-ended right of access has far-reaching consequences beyond interfering with Appellants' right to use and enjoy of their land, including decimating Appellants' ability to sell their properties or leverage any equity via credit facilities. *Litz v. Maryland Dept. of Env't*, 446 Md. 254, 267 (2016) (inverse condemnation claim arises from "hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value") (quoting *Coll. Bowl, Inc. v. Mayor & City Council Of Baltimore*, 394 Md. 482, 489 (2006)). This economic impact is undeniable and compensable.

49

The risk of losing property rights to eminent domain is a risk inherent to private landownership. To mitigate that risk, takings jurisprudence contemplates two important features: (1) the party taking property rights has secured the power of eminent domain; and (2) the condemnor has paid just compensation for the imposition. PSEG has done neither.

As Justice Holmes wrote more than a century ago: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Mackie*, 265 Md. at 422 (quoting Justice Holmes with approval); *State Roads Comm'n v. Jones,* 241 Md. 246, 250 (1966) (same). Yet, Justice Holmes cautioned: "When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." *Pa. Coal Co.*, 260 U.S. at 415.

The district court has made Justice Holmes' fear a reality. It authorized a right of entry while ignoring the constitutional guarantee of just compensation. A "desire to improve the public condition," however strong, "is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.*

50

The court-sanctioned right to invade Appellants' properties has real world consequences beyond the invasion of Appellants' property rights. Most of the affected property is Maryland farmland. JA1954, JA1957, JA1962, JA1968. Many farmer-Appellants operate working farms with livestock requiring controlled environments, including disease management and biosecurity practices, or row crops and permanent plantings vulnerable to damage if foreign foot traffic or equipment is introduced. A1953-1954, JA1956-1957, JA1962. On the latter point, the proposed MPRP route cuts through 522.6 acres of cultivated cropland. JA1940. Unrestricted access to these properties threatens biosecurity, risks physical damage to fields and infrastructure, and jeopardizes multi-generational family farms—all before PSEG has received regulatory approval to proceed with the MPRP.

For farmers, their land is more than just their livelihood; it is also their legacy. JA1953. Farmland is often passed down from one generation to the next. The disruption caused by the Preliminary Injunction could upend multi-generational family farms. JA1953, JA1969. This harm to Maryland agribusiness is particularly egregious given that PSEG may never secure PSC approval to build the MPRP.

The same is true for property which serves as a homestead. Like the farmer-Appellants, the homeowner-Appellants derive immense benefit from their land. JA1961-1963, JA1969. Parcels across the proposed MPRP route benefit from forest and wetlands conservation and preservation easements, including easements in favor

of the Maryland Agricultural Land Preservation Foundation. JA1952, JA1967. The proposed route runs through 245.8 acres of conserved land, and lies just 500 feet from another 1,801.7 acres of conserved land. JA1939. These easements preserve sensitive ecosystems and foster a serene living environment. JA1970, JA1958. To disrupt familial living quarters built adjacent to conserved and preserved land before PSEG has the right to advance its plans is to cause premature and unnecessary harm to landowners.

Landowners with plans to conduct future business on their property suffer a similar fate, because PSEG's unfettered access may forever damage land earmarked for commercial use. JA1971. PSEG's hypothetical financial harm pales in comparison to Appellants' tangible and imminent injuries.

To permit PSEG to forcibly enter private land without the power of eminent domain and without paying anything for such entry is to permit PSEG to violate the state and federal constitutions. There is no greater harm to private landowners. When the extreme harm to Appellants is balanced against the hypothetical harm to PSEG, the answer is clear: the Preliminary Injunction cannot stand.

   *4.  The public interest decisively favors vacating the injunction.*

The Preliminary Injunction is not in the public interest either. Such relief advances the economic interests of a publicly-traded company (JA185) while trampling the constitutional rights of hundreds of private citizens.

52

The Preliminary Injunction is a sweeping, unpaid encumbrance burdening private land along the MPRP's proposed route during the pendency of the PSC proceeding. Those with everything at risk make one simple ask: that PSEG fulfill all legal requirements before jeopardizing their property and their future.

The district court based its public interest analysis on an incorrect assertion that "advancing projects like this one is generally in the public interest," citing *Mountain Valley* and *Sage*. JA2518. In *Mountain Valley*, however, the Fourth Circuit explained that "the district courts relied heavily on the Certificate [CPCN] itself," which had already been issued based on a "finding that construction of the pipeline is in the public interest." *Mountain Valley*, 915 F.3d at 212. *See also Sage*, 361 F.3d at 830 (noting that FERC had already determined the project would "serve the public interest"). The same cannot be claimed here. No CPCN has been issued, and there has been no finding that the MPRP is in the public interest; those issues are pending before the PSC, as the district court acknowledged. JA2518. The district court's reliance on *Mountain Valley* and *Sage* was misplaced.

Before the district court, PSEG predicted disaster absent injunctive relief. It claimed that "[i]f the MPRP is not timely constructed and placed into operation, the reliability of an electric grid that serves millions of residential and commercial electricity consumers will be put at risk." JA2517. PSEG offered scant evidence for its dire predictions and produced no evidence that the MPRP could avert the

predicted disaster. On the contrary, the evidence demonstrated that the earliest the MPRP could provide electricity to any end user is June 2030. JA2287. Thus, if harm is bound for Marylanders in 2027, as PSEG predicts, there is no possibility that the MPRP neutralizes that harm.

Moreover, contingency plans are already in place to ensure that Maryland does not experience any negative effects should the MPRP and a broader package of grid upgrades not materialize, including keeping the Brandon Shores Power Plant and H.A. Wagner Generating Station operational through at least May 31, 2029. JA2287, JA2295-2309. Plus, the agreement between PJM and PSEG contemplates that the MPRP may be delayed or cancelled. JA163. FERC, too, understands this risk, as evidenced by its award of broad economic protections to PSEG should the MPRP stall or fail. JA1906-1919.

The district court appeared to assume that PPRP had already determined it was in the public interest to force access to private properties to conduct field studies. JA2518. PPRP made no such determination. PPRP merely posited to the PSC – the ultimate decision maker – that PSEG's CPCN Application is incomplete because, among various reasons, it omitted certain studies. JA2045, JA2048-2049. PPRP never even suggested that forcing access was in the public interest. Rather, PPRP simply noted that it needs field survey data to assess the MPRP – including data from invasive studies not within the scope of RP §12-111 (JA258, JA1849) – and that

gaining access would be time consuming. JA2323-2324. The district court cited no evidence or legal authority supporting the notion that an agency's request for an applicant to submit studies in connection with a development application necessarily means that the agency has determined the performance of those studies on private property is in the public interest. There is no such authority.

Accordingly, the public interest is best served by compelling PSEG to work through the PSC process and otherwise follow the law, not maneuver around it.

## CONCLUSION

The district court's injunction granting PSEG access to Appellants' properties should be vacated, and the case should be remanded for further proceedings.

Date: September 16, 2025

Respectfully submitted,

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein
David M. Wyand
Lauren M. McLarney
Rosenberg Martin Greenberg, LLP
25 S. Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
dwyand@rosenbergmartin.com
lmclarney@rosenbergmartin.com

*Attorneys for Appellants*

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument pursuant to Local Rule 34(a).

## CERTIFICATE OF COMPLIANCE

1.      Appellants' Brief complies with the type volume limitations of Fed. R. App. P. 28(a) and 32(a) because it contains 12,932 words, excluding the parts exempted by Rule 32(f).

2.      Appellants' Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point Times New Roman font.

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of September, 2025, a copy of the foregoing Appellants' Brief was filed and served through the CM/ECF System on all counsel of record, who are registered CM/ECF users.

*/s/ Harris W. Eisenstein*
Harris W. Eisenstein