No. 25-1730

# United States Court of Appeals for the Fourth Circuit

**ARENTZ FAMILY, LP,** et al.,

*Appellants,*

v.

**PSEG RENEWABLE TRANSMISSION LLC,**

*Appellee.*

On Appeal from the United States District Court
for the District of Maryland
(Adam B. Abelson, District Judge)

## APPELLEE'S BRIEF

Kurt J. Fischer
VENABLE LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
410-494-6200
KJFischer@Venable.com

J. Joseph Curran, III
Christopher S. Gunderson
Kenneth L. Thompson
Susan R. Schipper
Emily J. Wilson
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland, 21202
410-244-7400
JCurran@Venable.com
CSGunderson@Venable.com
KLThompson@Venable.com
SRSchipper@Venable.com
EJWilson@Venable.com

*Counsel for Appellee PSEG Renewable Transmission LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1730__        Caption: __Arentz Family, LP, et al. v. PSEG Renewable Transmission, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__PSEG RENEWABLE TRANSMISSION, LLC__
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?        ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Appellee is a wholly owned subsidiary of PSEG Renewable Ventures LLC, which is a wholly owned subsidiary of PSEG Energy Holdings L.L.C.  PSEG Energy Holdings L.L.C is a wholly owned subsidiary of Public Service Enterprise Group, Inc.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?        ☐ YES ☑ NO
    If yes, identify all such owners:

    Public Service Enterprise Group, Inc. is a publicly traded corporate entity and is the sole owner of PSEG Energy Holdings L.L.C., which in turn, is the sole owner of PSEG Renewable Ventures LLC, the sole owner of Appellee.

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Emily J. Wilson          Date:  10/16/2025

Counsel for:  PSEG Renewable Transmission LLC

Print to PDF for Filing

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................ iv

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF ISSUE PRESENTED FOR REVIEW ..................... 3

STATEMENT OF THE CASE ........................................................ 4

SUMMARY OF THE ARGUMENT ............................................... 11

ARGUMENT ............................................................................ 14

I.      The Injunction Below Is a Classic Prohibitory Injunction, So Heightened Scrutiny Does Not Apply .................................. 15

II.    The District Court Did Not Abuse Its Discretion to Conclude That PSEG Is Likely to Succeed on the Merits Because RP § 12-111(a) Grants It a Right to Access the Property Owners' Properties to Conduct Field Surveys. ............................................. 18

      A.    The Plain Language of RP § 12-111 .................................. 20

      B.    Interpreting RP § 12-111 in Context with the CPCN Statute ................................................................. 22

      C.    Legislative History and Intent of the Maryland General Assembly ................................................ 27

      D.    Interpreting the Statutory Scheme to be Workable ............ 33

III.   The District Court Did Not Abuse its Discretion to Conclude That PSEG Would be Irreparably Harmed Absent Preliminary Injunctive Relief. ................................................................ 38

IV.   The District Court Did Not Abuse its Discretion to Conclude That the Balance of Equities Favored Issuance of the Preliminary Injunction .......................................................................... 48

      A.    The Preliminary Injunction Does Not Authorize a *Per Se* Temporary Physical Taking .................................. 49

      B.    The Preliminary Injunction's Consistency with Common Law Rights of Entry .................................................. 51

V.    The District Court Did Not Abuse Its Discretion to Conclude That the Issuance of the Preliminary Injunction Was in the Public Interest. ................................................................................. 53

CONCLUSION ..................................................................................56

REQUEST FOR ORAL ARGUMENT ...................................................58

CERTIFICATE OF COMPLIANCE.......................................................59

CERTIFICATE OF SERVICE ...............................................................60

ADDENDUM .................................................................................ADD1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*,
289 F.Supp.3d 73 (D.D.C. Jan. 29, 2018) ............................................47

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)........................................46

*Andrews & Lawrence Prof'l Servs., LLC v. Mills*, 223 A.3d 947 (Md. 2020)
................................................................................................................ 22, 33

*Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76 (D. Mass. 2020) ...............16

*Barnes v. E-Sys., Inc. Grp. Hosp. Med & Surgical Ins. Plan*, 501 U.S. 1301 (1991)
................................................................................................................48

*Barr v. Atl. Coast Pipeline, LLC*, 815 S.E.2d 783 (Va. 2018) ...............................50

*Betty Jean Strom Tr. v. SCS Carbon Transp., LLC*, 11 N.W.3d 71 (S.D. 2024) ....50

*Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622 (D. Md. 2015) .......................30

*Bouton v. Potomac Edison Co.*, 418 A.2d 1168 (Md. 1980)..................................29

*Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty.*, 540 F. Supp. 3d 1291
(S.D. Ga. 2021).......................................................................................43

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003)...........................................53

*Brown v. Thompson*, 374 F.3d 253 (4th Cir. 2004) ................................................30

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ...................................... 49, 50

*Charlottesville Div. v. Dominion Transmission Inc.*, 138 F. Supp. 3d 673
(W.D. Va. 2015) .....................................................................................50

*City of Balt. Dev. Co. v. Carmel Realty Assocs.*, 395 Md. 299 (Md. 2006)............32

*Cnty. Comm'rs of Frederick Cnty. v. Schrodel*, 577 A.2d 39 (Md. 1990) ..............29

*Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 287 A.3d 271 (Md. 2022) ............................................................................................... 33, 37

*Continental Resources, Inc. v. Langved*, No. 4:15–cv–19, 2015 WL 686965 (D.N.D. Feb. 18, 2015) ................................................................47

*Cunningham v. Feinberg*, 107 A.3d 1194 (Md. 2015) ...........................................30

*Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1 (D.D.C. 2015)...................17

*Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 170 A. 590 (Md. 1934). .................27

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1991)..44

*Diversified Mortg. Invs. v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571 (2d Cir. 1976) ...............................................................................................17

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ...........................................17

*E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) ......................... passim

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .............................31

*Hollabaugh v. MRO Corp.*, 339 A.3d 188 (Md. 2025) ..........................................25

*In re Tenn. Gas Pipeline Co. Litig.*, No. 3:24-cv-00469, 2025 WL 1336322 (M.D. Tenn. May 6, 2025) ...............................................................43

*J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 792 A.2d 288 (Md. 2002) ................................................................................................32

*J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Planning Comm'n*, 792 A.2d 288 (Md. 2002) ................................................................................51

*Johnson v. Mayor of Balt.*, 61 A.3d 33 (Md. 2013)................................................30

*Julian Dev., LLC v. Old Vill. Mill, LLC*, No. 13-cv-01510, 2014 WL 1414319 (D. Conn. Apr. 11, 2014) .......................................................16

*King v. Mayor of Rockville,* 447 A.2d 118 (Md. Ct. Spec. App. 1982) ..... 19, 34, 36

*Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380 (4th Cir. 2000)..............42

*Lawrence v. State*, 257 A.3d 588 (Md. 2021)..............................................33

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ......................................................................................................42

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ......................................................................................................15

*Lockshin v. Semsker*, 987 A.2d 18 (Md. 2010).......................................20

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108 (2d Cir. 2006)...15

*Mackie v. Mayor of Elkton*, 290 A.2d 500 (Md. 1972) ...........................51

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009)................................................................................................15

*Mayor of Baltimore City v. Valsamaki*, 916 A.2d 324 (Md. 2007) ........................32

*McCurdy v. Mountain Valley Pipeline, LLC*, No. 15-03833, 2015 WL 4497407 (S.D. W. Va. 2015). ....................................................................................24

*Miceli v. Foley*, 575 A.2d 1249 (Md. App. 1990) ...................................27

*Mohan v. State*, 289 A.3d 756 (Md. App. 2023) ............................. 20, 28

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) ................................................................................................ passim

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353 (4th Cir. 2019). ...............................................................................14

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025) ..............................................................................48

*Palmer v. Atl. Coast Pipeline, LLC*, 801 S.E.2d 414 (Va. 2017) .................... 35, 50

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013)........................... 14, 18, 41

*Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39 (D.S.C. 2018) ..............46

*Potomac Elec. Power Co. v. Montgomery Cnty.*, 560 A.2d 50 (Md. App. 1989)...29

*PSEG Renewable Transmission LLC v. Arentz*, No. 25-cv-1235, 2025 WL 1919947 (D. Md. July 11, 2025) ...........................................................10

*Real Time Med. Sys., Inc. v. PointClickCare Tech., Inc.*, 131 F.4th 205 (4th Cir. 2025) ................................................................................... 16, 52

*Reichs Ford Rd. Joint Venture v. St. Rds. Comm'n of the St. Highway Admin.*, 880 A.2d 307 (Md. 2005) ........................................................................50

*Scriber v. State*, 86 A.3d 1260 (Md. 2014)............................................................25

*SCS Carbon Transp. LLC v. Malloy*, 7 N.W.3d 268 (N.D. 2024)..........................50

*Steuart v. City of Balt.*, 7 Md. 500 (1855) ...............................................35

*Summit Carbon Sols., LLC v. Kasische*, 14 N.W.3d 119 (Iowa 2024)...................50

*Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litigation)*, 333 F.3d 517 (4th Cir. 2003),...........................................44

*Town of Forest Heights v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 205 A.3d 1067 (Md. 2019) .............................................................................31

*Transcontinental Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2018). ...........................................................................................43

*Transource Pa., LLC v. Defrank*, --- F.4th ---, No. 24-1045, 2025 WL 2554133 (3d Cir. Sep. 5, 2025). .........................................................................56

*Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll.*, 23 F.4th 1262 (10th Cir. 2022) ...........................................................................................15

*Twigg v. State*, 133 A.3d 1125 (Md. 2016)............................................................33

*Westminster Mgmt., LLC v. Smith*, 312 A.3d 741 (Md. 2024) ................................25

*Wheeling v. Selene Fin. LP*, 250 A.3d 197 (Md. 2021)............................................28

*Whiting-Turner Contractor Co. v. Fitzpatrick*, 783 A.2d 667 (Md. 2001) .............28

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)................................ 11, 41

*Wright v. Sw. Airlines*, 319 F. App'x 232 (4th Cir. 2009)......................................42

*Zografos v. Mayor of Balt.*, 884 A.2d 770 (Md. App. 2005)....................................32

**Statutes**

16 U.S.C. § 791a ................................................................................................4

16 U.S.C. § 824 ...............................................................................................4, 5

Md. Code Ann., Nat. Res. § 3-303 ................................................................8, 54

Md. Code Ann., Nat. Res. § 3-305 ....................................................................37

Md. Code Ann., Nat. Res. § 3-306 ................................................................8, 35

Md. Code Ann., Pub. Util. § 7-207 ............................................................ passim

Md. Code Ann., Pub. Util. § 1-101 ....................................................................37

Md. Code Ann., Real Prop. § 12-111 .......................................................... passim

Md. Code Ann., Transp. § 8-320 .......................................................................27

Md. Code Ann., Transp. § 8-321 .......................................................................27

**Other Authorities**

1968 Md. Laws Ch. 493 (S.B. 22) ......................................................................28

1998 Md. Laws Ch. 8 (S.B. 1) ...........................................................................28

1999 Md. Laws Ch. 3 (S.B. 300) .......................................................................28

2015 Maryland Laws Ch. 174 (S.B. 460) ..........................................................29

2017 Md. Laws Ch. 840 (S.B. 969) ...................................................................30

Acquire, Black's Law Dictionary (12th ed. 2024) .............................................25

Errol E. Meidinger, *The "Public Uses" of Eminent Domain: History and Policy*,
  11 Env't L. 1 (1980) .......................................................................................18

Exercise, Black's Law Dictionary (12th ed. 2024)....................................................26

Fiscal and Policy Note, S.B. 460, at 2–3 (2015)................................................ 29, 31

*In re Application of PSEG Renewable Transmission LLC*, Case No. 9773, Filing No. 592, at 1 (Md. Pub. Serv. Comm'n Aug. 13, 2025) .....................................55

*In re Application of PSEG Renewable Transmission LLC*, Case No. 9773, Filing No. 611, at 1 (Md. Pub. Serv. Comm'n Aug. 14, 2025) .....................................55

*In re Application of PSEG Renewable Transmission LLC*, Case No. 9773, Filing No. 639, at 6 (Md. Pub. Serv. Comm'n Sept. 11, 2025) ......................................9

*Intra-PJM Tariffs, OA Schedule 6 Sec. 1.5, Procedure for Development of the Regional Transmission Expansion Plan* ("Schedule 6 Sec. 1.5"), FERC Dkt. No. ER22-00451-000 (Jan. 19, 2022) ...........................................................................5

*PSEG Renewable Transmission LLC Responses to PPRP's Completeness Recommendation*, Case No. 9773, Filing No. 333, at 6 (Md. Pub. Serv. Comm'n, April 10, 2025) ...........................................................................................................8

*Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, 76 Fed. Reg. 49,842 (2011) ...........................................................................................................................4, 5

**Treatises**

Restatement of Torts § 211 (1934) .......................................................................49

**Regulations**

COMAR 20.79.01.06 ..............................................................................................34

COMAR 20.79.04.04 ..............................................................................................34

## PRELIMINARY STATEMENT

Appellee PSEG Renewable Transmission LLC ("PSEG") is contractually obligated to construct and place into service an approximately 67-mile high-voltage electric transmission line in Maryland. The project is called the Maryland Piedmont Reliability Project ("MPRP"). It is designed to prevent the severe overloading of the regional power grid, which, if left unaddressed, could lead to system collapse and blackouts.

PSEG's contractual obligation is to PJM Interconnection, L.L.C. ("PJM"), the regional transmission organization authorized by the Federal Energy Regulatory Commission ("FERC") to operate and manage the electric transmission grid in 13 states, including Maryland. PJM has determined that, if the MPRP is not in service by June 2027, existing transmission lines within its PJM's footprint will be forced to transmit more power than that for which they are designed. If the MPRP is not constructed as close as possible to June 2027, PJM forecasts that the risks to the electrical grid will be severe.

PSEG cannot begin constructing the MPRP until it has been approved by the Maryland Public Service Commission ("PSC"). The PSC and seven Maryland state agencies have required PSEG to conduct environmental and land surveys along the proposed alignment for the MPRP as a precondition to the PSC's review of the project. Maryland law authorizes entities "having the power of eminent domain,"

1

such as PSEG, to access private property to conduct these surveys in connection with a "future public use of the property." Md. Code Ann., Real Property ("RP") § 12-111(a). Nevertheless, certain property owners ("Appellants" or "Property Owners") have refused PSEG access to their properties to conduct these surveys, requiring PSEG to seek injunctive relief to stop any further interference with PSEG's right of access under RP § 12-111.

## <u>STATEMENT OF ISSUE PRESENTED FOR REVIEW</u>

Did the District Court err in granting Appellee's motion for preliminary injunction prohibiting Property Owners from interfering with PSEG's right of access under RP § 12-111?

## STATEMENT OF THE CASE

The MPRP is a proposed transmission line spanning approximately 67 miles in Maryland.  JA0137; JA0144.  PJM has determined that the MPRP is necessary to reinforce the region's electric grid, which is forecast to experience instability and become overloaded under certain conditions beginning in 2027.  JA0145.

PJM is an independent, federally-regulated regional transmission organization.  It is charged by FERC with responsibility for ensuring safe and reliable operation of the high-voltage electrical grid in its region.  JA0144 (listing 13 states within PJM's regional grid).  The Federal Power Act, 16 U.S.C. § 791a *et seq*., empowers and requires FERC to regulate "the transmission of electric energy in interstate commerce."  16 U.S.C. § 824(a).  In turn, FERC imposes reliability criteria and standards to which PJM must adhere when planning and maintaining the regional electric transmission system.  *See Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, 76 Fed. Reg. 49,842 (2011), *order on reh'g*, Order No. 1000–A, 139 FERC ¶ 61,132, 77 Fed. Reg. 32,184 (2012), *order on reh'g*, Order No. 1000–B, 141 FERC ¶ 61,044, 77 Fed. Reg. 64,890 (2012), https://tinyurl.com/5yf52mmt.

As part of its federal charge, if PJM determines that the existing transmission grid will violate established reliability criteria under forecasted operational conditions, PJM is obligated to conduct a competitive solicitation of proposed

4

solutions from qualified transmission developers to prevent those reliability violations from occurring. JA0184-190. PJM's process for soliciting and selecting proposed solutions is governed by criteria and protocols contained in Schedule 6, Section 1.5.8 of PJM's Operating Agreement. JA0185; *see* PJM, *Intra-PJM Tariffs, OA Schedule 6 Sec. 1.5, Procedure for Development of the Regional Transmission Expansion Plan* ("Schedule 6 Sec. 1.5"), FERC Dkt. No. ER22-00451-000 (Jan. 19, 2022), https://tinyurl.com/2mm8p2c2. PJM developed these criteria and protocols as required by FERC. *See* Order No. 1000, 136 FERC ¶ 61,051, at 7.

For its proposal to be selected by PJM in a competitive solicitation, a transmission developer must pre-qualify as eligible to be a "Designated Entity." *See* Schedule 6 Sec. 1.5 § 1.5.8(a). To pre-qualify as eligible to be a Designated Entity, a transmission owner or developer must (1) make a detailed showing to PJM regarding its project construction, maintenance, and financing qualifications; and (2) either already be a signatory to or agree to sign PJM's Consolidated Transmission Owners Agreement. *Id.* § 1.5.8(a)(1). By virtue of pre-qualifying as eligible to be a Designated Entity and being selected by PJM through the competitive solicitation process, a transmission developer will be a public utility regulated by FERC when its project goes in service. *See generally* 16 U.S.C. § 824(e).

PJM followed this competitive solicitation process when it selected PSEG to construct the MPRP. After observing significant load growth forecasted for the

region, PJM identified numerous high-voltage lines in its region that will become severely overloaded in 2027, meaning that they will transmit levels of power well beyond their design specifications. JA0145. Under these conditions, absent intervention to reinforce the grid, PJM forecasts a danger of system collapse and electric service blackouts as soon as June 2027. JA0091.

In 2023, PJM opened a competitive planning window to solicit solutions from qualified transmission owners and developers to prevent these reliability violations from occurring. JA0146. PSEG submitted the MPRP as a proposed solution. JA0146. Having already determined PSEG's eligibility to be a Designated Entity, PJM then selected the MPRP as an efficient and cost-effective solution to forecasted reliability violations. JA0158. PSEG accepted the designation and subsequently executed a Designated Entity Agreement ("DEA") with PJM, which obligates PSEG to construct and place the MPRP into service by June 1, 2027. JA0174; JA0176; *see* JA0158 (DEA).

PJM then filed the DEA with FERC, explaining that PSEG "was pre-qualified under Schedule 6, section 1.5.8(a) as eligible to be" a Designated Entity. JA0185. PJM further explained that PSEG's parent company, through its subsidiaries, already "serves 2.2 million electric customers and 1.8 million gas customers" and owns and maintains 834 miles of transmission rights-of-way. JA0185. FERC accepted the

DEA for filing on September 10, 2024. JA0248. PSEG will be a public utility regulated by FERC once the MPRP is placed in operation. JA0147.

Before PSEG may begin constructing the MPRP, however, the Company must apply for and receive a certificate of public convenience and necessity ("CPCN") from the PSC. Md. Code Ann., Pub. Util. ("PUA") § 7-207(b)(3)(i). PSEG filed its CPCN application on December 31, 2024, which included a proposed transmission line route. JA0147; *see In re PSEG Transmission LLC*, Case No. 9773, Filing No. 1 (Md. Pub. Serv. Comm'n Dec. 31, 2024), https://tinyurl.com/48npdr3b (CPCN application). This route was selected by PSEG—after months of evaluating numerous alternatives—as the least impactful route based on environmental, social, land use, and engineering criteria. JA0147. Although PSEG sought to conduct preliminary field surveys along the proposed route to inform its CPCN application, many property owners along the route (including Property Owners) refused. *See* JA0301–1713; JA1753–89. Accordingly, PSEG submitted its application and "put considerable effort into providing as much desktop-based environmental information as [wa]s currently available." JA0258.

The PSC's CPCN review process involves many stakeholders, including state agencies that are required by law to provide recommendations to the PSC on CPCN applications. PUA § 7-207(c)(2), (d)(5), (e)(2). One such stakeholder is the Power Plant Research Program ("PPRP"), a division of the Maryland Department of

7

Natural Resources ("DNR"). Md. Code Ann., Nat. Res. ("NR") § 3-303. PPRP is statutorily obligated to analyze the environmental and socioeconomic impacts of any proposed high-voltage transmission line and provide licensing recommendations to the PSC on behalf of seven state agencies. NR § 3-306(b)(1)(i).

The PSC asked PPRP to determine whether PSEG's CPCN application was "administratively complete" and complies with application requirements. JA0252. On March 26, 2025, PPRP recommended to the PSC that PSEG's application should not be deemed "administratively complete" without data from several types of environmental and cultural field surveys from properties along the proposed route. JA0255–60. These surveys would evaluate the presence of wetlands, forests, endangered species, and historical landmarks.[1] JA0258–59. PPRP concluded it could not provide its recommended licensing conditions to the PSC without these surveys. JA0259. PPRP recommended that the PSC's review of PSEG's application not proceed until the required field surveys could be obtained. JA0260.

PPRP was apprised that, notwithstanding the provisions of RP § 12-111(a), many property owners had denied PSEG access to conduct the surveys. JA0258. Nevertheless, PPRP indicated the surveys were "imperative to verify and augment

---

[1] PPRP also requested geotechnical field surveys, JA0258, but PSEG informed PPRP that geotechnical surveys are not authorized under Maryland law. *See PSEG Renewable Transmission LLC Responses to PPRP's Completeness Recommendation*, Case No. 9773, Filing No. 333, at 6 (Md. Pub. Serv. Comm'n, April 10, 2025), https://tinyurl.com/48npdr3b.

8

initial desktop information to confirm that the Project's effects are correctly documented." JA0258. PPRP also indicated that "a desktop survey is insufficient" and that the application would need to be updated with field survey data. JA0258. Since this appeal was filed, the PSC has affirmed that PPRP's requested surveys are necessary for the Company's CPCN application to proceed. *See In re Application of PSEG Renewable Transmission LLC* ("Procedural Schedule"), Case No. 9773, Filing No. 639, at 6 (Md. Pub. Serv. Comm'n Sept. 11, 2025), https://tinyurl.com/48npdr3b (finding PPRP cannot discharge its statutory duties "without the required field surveys").

PSEG made real and bona fide efforts over the course of months to notify Property Owners of its intent to enter properties to conduct these surveys pursuant to RP § 12-111(a). Between October 2024 and extending into February 2025, PSEG attempted to contact Property Owners for access to their properties to conduct surveys. *See* JA0301–1713; JA1753–89. PSEG hired land agents to negotiate with Property Owners on its behalf. *See* JA0320–21. At a minimum, each Property Owner received two written letters indicating PSEG sought temporary access "to perform studies" and "to evaluate [the property's] suitability for the project." *See*, *e.g.*, JA0309–17. Every Property Owner refused PSEG's access, minus one who did not respond to PSEG's attempts at communication. *See* JA2484–89 (summarizing communications).

9

Accordingly, PSEG filed a petition for injunctive relief in the United States District Court for the District of Maryland against Property Owners, seeking an order prohibiting any interference with PSEG's statutory right to enter their properties to conduct necessary field surveys. JA0049–135. Following extensive briefing and a hearing, on June 20, 2025, the District Court granted a motion for a preliminary injunction filed by PSEG and enjoined the Property Owners from interfering with PSEG's right of entry under RP § 12-111(a). JA2468–519 (Memorandum Opinion); JA2520–21 (Order); JA2522 (Preliminary Injunction).

Thereafter, Property Owners moved to stay the preliminary injunction and, in the alternative, to amend the preliminary injunction for inclusion of a bond and for clarification that only surveys authorized by RP § 12-111 were permitted. JA2525; Defs.' Mem. Supp. Mot. Stay Prelim. Inj., *PSEG Renewable Transmission LLC v. Arentz*, No. 25-cv-1235, 2025 WL 1919947 (D. Md. July 11, 2025), ECF 258-1. PSEG consented to a reasonable bond and agreed that express reference to RP § 12-111, which authorizes only minimally intrusive surveys, was appropriate. JA2528; Pl.'s Resp. Opp. Mot. Stay Prelim. Inj., No. 25-cv-1235, 2025 WL 1919947 (D. Md. July 2, 2025), ECF 263. The District Court denied Property Owners' motion to stay. JA2540-46. It also imposed a reasonable bond and issued an amended injunction that expressly referenced RP § 12-111, thus permitting only minimally invasive surveys. *See* JA2545 (Memorandum Opinion and Order); JA2547–48 (Amended

10

Preliminary Injunction). (Hereafter, the amended preliminary injunction will be referred to as the "Preliminary Injunction.") Property Owners now ask this Court to reverse the District Court's issuance of the Preliminary Injunction.

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion when it granted PSEG's motion for a preliminary injunction that prohibits Property Owners from interfering with PSEG's right of access under RP § 12-111. The District Court correctly found that PSEG satisfied each of the four factors required for a preliminary injunction under *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

First, the District Court did not abuse its discretion in finding that PSEG was likely to succeed on the merits of its claim for injunctive relief under RP § 12-111. RP § 12-111(a) authorizes "any body . . . corporate having the power of eminent domain" to enter onto private land to conduct surveys or obtain information "relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement." PSEG "ha[s] the power of eminent domain" under RP § 12-111 because it will be regulated as a federal public utility when the MPRP goes in-service. Therefore, under PUA § 7-207(b)(3), PSEG has the power of eminent domain in Maryland, with the right to apply for a CPCN to "exercise a right of condemnation" after a CPCN is issued. Contrary to Property Owners' interpretation, RP § 12-111(a) applies to entities, like PSEG, who are conducting

11

preliminary surveys for a future public utility project before having satisfied all preconditions (or approvals) to exercising eminent domain authority.

Second, the District Court did not abuse its discretion when it found that PSEG would suffer irreparable harm absent a preliminary injunction. Without preliminary relief, Property Owners' obstruction of PSEG's statutory right of access would have guaranteed PSEG to miss the in-service date set by its contract with PJM. In such an event, PSEG would have suffered monetary loss in the form of lost revenue and other costs. Moreover, without the Preliminary Injunction, PSEG would have been continually deprived of its statutory right under RP § 12-111(a) to enter Property Owners' properties, which is irreparable harm in and of itself.

Third, the District Court did not abuse its discretion when it determined that the balance of equities tipped in PSEG's favor. The District Court properly found that PSEG faces irreparable harms in the absence of preliminary relief, while Property Owners face no material harm from limited, minimally invasive field surveys, particularly since Property Owners have a right of recourse under RP § 12-111(c) for any damages caused by surveying activities.

Fourth, and finally, the District Court did not abuse its discretion in concluding that a preliminary injunction was in the public interest. The District Court properly weighed the evidence before it and appropriately deferred to the

Maryland state agencies who have required the surveys at issue, as well as to PJM, who is responsible for operating and managing the regional electric grid.

## STANDARD OF REVIEW

The Court reviews the grant or denial of a preliminary injunction for abuse of discretion. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). Under this standard, the Court reviews "factual findings for clear error and legal conclusions *de novo*." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).

## ARGUMENT

The District Court did not abuse its discretion by granting a preliminary injunction that prohibits the Property Owners from blocking PSEG's statutory right of access codified by RP § 12-111. The four factors that a district court must consider in deciding whether to grant a preliminary injunction all militate strongly in favor of issuing the injunction. RP § 12-111 grants PSEG a right to enter private property to take surveys for a public utility project, and judicial intervention is authorized under the law if a property owner refuses that access. Moreover, denying the preliminary injunction would cause irreparable harm in numerous ways by grinding the PSC's review of the MPRP to a halt and subjecting PSEG to irretrievable financial losses. Lastly, both the balance of equities among the parties and the public interest in maintaining the stability of the electric grid strongly favor the injunction.

14

### I.     The Injunction Below Is a Classic Prohibitory Injunction, So Heightened Scrutiny Does Not Apply.

Property Owners incorrectly argue that PSEG sought a "mandatory injunction" and therefore a heightened standard of review applies. Property Owners' Br. 10–12. But the District Court entered a classic prohibitory injunction. Preliminary injunctions are "prohibitory" when they restrain or "prohibit the defendant from doing something." *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll.*, 23 F.4th 1262, 1274 (10th Cir. 2022); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) ("A prohibitory injunction prohibits a party from taking action[.]"); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) ("[A] prohibitory injunction is one that "forbids or restrains an act." (quoting Black's Law Dictionary 788 (7th ed. 1999))).

On the other hand, preliminary injunctions are "'mandatory' when they 'affirmatively require action.'" *Trial Laws. Coll.*, 23 F.4th at 1275 (citation omitted). Said differently, prohibitory injunctions "maintain the status quo," while "mandatory injunctions alter the status quo." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted).

The Preliminary Injunction does not compel action by the Property Owners— it prohibits them from continuing to interfere with PSEG's right to take surveys under RP § 12-111. Property Owners argue that the Preliminary Injunction was a

mandatory injunction because "[p]rior to June 20, 2025, PSEG could not enter [the Property Owners'] properties. Now PSEG can." Property Owners' Br. 11. But the fact that the Preliminary Injunction affirms PSEG's statutory right of access (and restrains Property Owners from interfering with that right) proves that it is a prohibitory injunction, not a mandatory one. PSEG's right of access emanates from RP § 12-111, not the Preliminary Injunction. That is, PSEG's statutory right to "[e]nter on any private land" to conduct utility surveys in connection with a proposed public project preexisted the Preliminary Injunction. RP § 12-111(a)(1). The District Court merely prohibited the Property Owners from obstructing this preexisting right, thereby maintaining the status quo. *See* JA2542–43 ("The preliminary injunction this Court has granted simply confirms PSEG's preexisting legal entitlement to conduct the studies at issue[.]"); *Real Time Med. Sys., Inc. v. PointClickCare Tech., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025) (defining the "status quo" as "the last uncontested status between the parties which preceded the controversy" (citation omitted)); *see, e.g.*, *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 82–83, 86 (D. Mass. 2020) (finding injunction requiring defendant to dismantle six barriers blocking plaintiffs' road was prohibitory); *Julian Dev., LLC v. Old Vill. Mill, LLC*, No. 13-cv-01510, 2014 WL 1414319, at *5–6 (D. Conn. Apr. 11, 2014) (finding injunction "directing [defendant] to refrain from interfering with

16

[plaintiffs'] right to enter . . . the property" to excavate stone was prohibitory). Therefore, heightened scrutiny does not apply.

Even if the Preliminary Injunction were a mandatory one, PSEG's entitlement to relief is clear. Although mandatory injunctions are "disfavored," mandatory injunctive relief is available "where 'the applicants' right to relief [is] indisputably clear[.]'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (citation omitted) (alteration in original). Property Owners' objections to PSEG's right to conduct the surveys authorized by RP § 12-111(a) present a discrete legal issue that the District Court correctly resolved in PSEG's favor. Property Owners contend that PSEG has no right to take the surveys because it is not a body corporate having the power of eminent domain under RP § 12-111(a). As will be explained below, Property Owners' argument rests on an incorrect and illogical interpretation of RP § 12-111(a) and, in turn, PUA § 7-207(b), which gives the power of eminent domain to federal public utilities, such as PSEG.

Finally, the Property Owners claim the injunction should be closely scrutinized because it is "largely congruent with . . . final relief," citing caselaw from other circuits. Property Owners' Br. 11–12 (citing *Diversified Mortg. Invs. v. U.S. Life Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969); *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 6–7 (D.D.C. 2015)). But that is not the law in this circuit. In *Pashby*

17

*v. Delia*, this Court declined to adopt a standard by which "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial" would be strictly scrutinized. 709 F.3d at 319–20. Instead, the Court reiterated, "to determine whether we should apply a heightened standard of review in this case, we must ascertain whether the injunction maintains the status quo." *Id.* at 320.

## II. The District Court Did Not Abuse Its Discretion to Conclude That PSEG Is Likely to Succeed on the Merits Because RP § 12-111(a) Grants It a Right to Access the Property Owners' Properties to Conduct Field Surveys.

The District Court did not abuse its discretion when it ruled that PSEG is likely to succeed on the merits because PSEG has a right of access under RP § 12-111(a). JA2468–219. This statute allows any "body politic or corporate having the power of eminent domain" to enter property and conduct surveys "relating to the acquisition or future public use of the property." RP § 12-111(a).[2] The statute allows entities having the power of eminent domain to conduct preliminary surveys that may be necessary to determine the nature and scope of a future public project. RP §

---

[2] Amici suggest that only a "body politic" or "instrumentality of the State of Maryland" may exercise access rights under RP § 12-111(a). Amicus Br. 8. But the statute expressly states that "corporate" entities also enjoy the right of access it provides. RP § 12-111(a). Bodies "corporate," like public utilities and privately-owned railroads, have been granted the power of eminent domain to construct public projects since at least the mid-19th century. Errol E. Meidinger, *The "Public Uses" of Eminent Domain: History and Policy*, 11 Env't L. 1, 32 (1980) (discussing historical development).

12-111(a)(1)–(3) (describing the authorized surveys); *King v. Mayor of Rockville,* 447 A.2d 118, 122 (Md. Ct. Spec. App. 1982) ("The findings from these permitted activities is necessary for determining whether [a] particular piece of property should be taken." (internal quotations quotation marks and citation omitted)).  The only requirement prior to exercising the right of access is to make "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry."  RP § 12-111(a).  Once that sole requirement is satisfied, and if surveyors are "refused permission to enter or remain" on the property to conduct the surveys, the entity may seek a court order enforcing its right of access.  RP § 12-111(b).

The District Court carefully analyzed RP § 12-111, concluding that "PSEG has made a strong showing that it is likely to succeed on the merits."  JA2512.  As to whether PSEG qualifies as a "body . . . corporate having the power of eminent domain" within the meaning of the statute, the District Court exhaustively reviewed "the text, statutory and regulatory context, legislative history, and purpose of § 12-111."  JA2493.  The District Court concluded that "[s]everal aspects of the text," JA2494, as well as "[s]everal other considerations, beyond the four corners of the statute . . . strongly support the conclusion that PSEG qualifies as an entity 'having the power of eminent domain' within the meaning of § 12-111."  JA2496.

As to whether PSEG made bona fide efforts to notify Property Owners with respect to the proposed entry on their land, the District Court concluded that

19

"[Property Owners] do not seriously dispute that all of the letters [filed with the court by PSEG] were sent, and were received[.]" JA2510. The District Court then held that PSEG has "clearly" shown "a likelihood" that "they satisfied the statutory requirements." *Id*.

Property Owners only challenge the District Court's conclusion that PSEG likely qualifies as a "body . . . corporate having the power of eminent domain." JA2509; *see* Property Owners' Br. 14–19. As discussed below, the District Court did not abuse its discretion in reaching this conclusion.

### A. The Plain Language of RP § 12-111

First, Property Owners' reading of RP § 12-111 does not comport with the plain language of the statute. "Statutory interpretation begins with the plain language." *Mohan v. State*, 289 A.3d 756, 762 (Md. App. 2023) (citation omitted). "If the plain language of the statute is unambiguous, [the] inquiry ends, and the statute is applied as written." *Id.* (citing *Lockshin v. Semsker*, 987 A.2d 18, 28–29 (Md. 2010)).

The text of RP § 12-111 reveals the General Assembly's intent that the right of access would apply to entities, like PSEG, who are conducting surveys for a future public utility project. The phrase "having the power of eminent domain" is used in the context of the "*future*," "*public*" use of the property. RP § 12-111(a) (emphasis added).

20

Under Property Owners' proposed construction, only an entity that has satisfied all preconditions to the exercise of eminent domain—that is, received authorization to *exercise* the power of eminent domain—qualifies under RP § 12-111(a) as an entity "having the power of eminent domain," thus possessing the right of access to conduct surveys for a proposed project. Property Owners' Br. 14–16. This interpretation, however, ignores and contradicts the plain text of the statute. By relating the right of access under RP § 12-111(a) to *either* the "acquisition" of the property *or* the "future public use" of the property, the General Assembly clearly considered the right of access to apply to a public project that is under development, even if the project has not yet satisfied all preconditions to exercise the power of eminent domain.

Additionally, the General Assembly authorized the right of access for "any governmental report, undertaking, or improvement[.]" RP § 12-111(a)(1). This language also demonstrates the intent that the phrase "having the power of eminent domain" would apply in circumstances where final governmental authorization for the "acquisition" of the property had not yet been received, but the surveys could be used to inform the government's review of the proposed "future public use" of the property. This is the circumstance presented here: PPRP is requiring PSEG to perform surveys to inform PPRP's governmental report to the PSC analyzing the proposed future public use of Property Owners' properties. Property Owners'

21

construction would preclude this logical interpretation and harmonization of the plain text of RP § 12-111(a) with other statutes governing the CPCN approval process, as will be set forth below. *See Andrews & Lawrence Prof'l Servs., LLC v. Mills*, 223 A.3d 947, 960, 968 (Md. 2020) (recognizing related provisions must be "read together and harmonized to the extent possible" as the "Legislature intends its enactments to operate together as a consistent and harmonious body of law" (citations omitted)).

## B. Interpreting RP § 12-111 in Context with the CPCN Statute

PSEG "ha[s] the power of eminent domain" under RP § 12-111 based on the plain text of PUA § 7-207, which authorizes entities that will be federally regulated public utilities to apply for a CPCN and then "exercise a right of condemnation" once the CPCN is issued.

Specifically, PUA § 7-207(b)(3)(i) states that, unless a CPCN is first obtained from the PSC, "a person may not begin construction of an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts or exercise a right of condemnation with the construction." PUA § 7-207(b)(3)(iii) then identifies the three classes of persons who may obtain a CPCN to construct a line (and, in turn, "exercise a right of condemnation"):

(1) electric companies created under Maryland law;
(2) federally regulated public utilities; and
(3) entities that will be federally regulated public utilities when a transmission line starts commercial operation.

22

*See* PUA § 7-207(b)(3)(iii). (Hereafter, entities qualifying under the second and third classes will be referred to as "federal public utilities"). In other words, the General Assembly has authorized three types of entities that may apply for a CPCN to construct a high-voltage transmission line and exercise eminent domain. Those three types of entities have a "right of condemnation," but that right may only be "exercise[d]" after a CPCN is issued. PUA § 7-207(b)(3)(i).

PSEG is a member of the third class listed above; it has been approved by PJM and FERC to be a federal public utility when the MPRP goes into service. JA0147. PJM advised FERC that PSEG was pre-qualified under PJM's Operating Agreement as eligible to be designated rights to the MPRP. JA0185. FERC subsequently accepted the DEA between PJM and PSEG. JA0248; JA0157-182. As the Designated Entity responsible for the construction, maintenance, and financing of the MPRP, PSEG will be a federal public utility once the MPRP goes into operation. JA0147. PSEG is thus authorized by PUA § 7-207(b) to (1) apply for a CPCN to construct a high-voltage transmission line, and in turn, (2) "exercise a right of condemnation" if its application is granted. PSEG therefore already has the "right of condemnation" contemplated by PUA § 7-207(b)(3), and it is a body corporate "having the power of eminent domain" under RP § 12-111(a). JA2493.

Property Owners argue that PSEG is not a "body . . . corporate having the power of eminent domain" under RP § 12-111 because, under PUA § 7-207, PSEG

23

can exercise the power of eminent domain "only 'on issuance' of a CPCN." *See* Property Owners' Br. 32 (quoting PUA § 7-207(b)(3)(iii)(2)). In other words, the Property Owners suggest that the PSC grants the power of eminent domain when it issues a CPCN. This reading of RP § 12-111(a) and PUA § 7-207 fails for the reasons set forth below.

Property Owners' construction of the CPCN statute ignores PUA § 7-207(b)(3)(i) and § 7-207(b)(3)(iii), discussed above, and focuses exclusively on PUA § 7-207(b)(3)(v). They claim PUA § 7-207(b)(3)(v) "expressly" states that the PSC "grant[s]" the power of eminent domain power by the issuance of a CPCN, such that "the *grant* of eminent domain power under the statute occurs only 'on issuance of a CPCN,' as expressly stated in PUA § 7-207(b)(3)(v)." Property Owners' Br. 32 (emphasis added); *id.* at 17.[3]

But nothing in PUA § 7-207(b)(3)(v) states—expressly or otherwise—that entities are "granted" the power of eminent domain "on issuance of a [CPCN]." *Id.* at 24. Rather, the provision states that federal public utilities "may *acquire property*

---

[3] Amici cite the Southern District of West Virginia's unpublished opinion in *McCurdy v. Mountain Valley Pipeline, LLC*, to argue that an entity which has not been granted a CPCN does not have the power of eminent domain. Amicus Br. 12–13. But that case construed the Natural Gas Act ("NGA"), not Maryland law. *See McCurdy v. Mountain Valley Pipeline, LLC*, No. 15-03833, 2015 WL 4497407, at *2–3 (S.D. W. Va. 2015). In addition, the case addressed a motion to remand for lack of subject matter jurisdiction and reached no holding on the merits of the NGA issues presented. *See id.* at *1, 7.

24

*by condemnation*" upon the "issuance of a [CPCN]."   PUA § 7-207(b)(3)(v) (emphasis added).   To interpret this language, courts examine its "everyday meaning," *Scriber v. State*, 86 A.3d 1260, 1266 (Md. 2014), by consulting "dictionary definitions," *Westminster Mgmt., LLC v. Smith*, 312 A.3d 741, 748 (Md. 2024).   The ordinary meaning of "acquire" is "to gain possession or control of." Acquire, Black's Law Dictionary (12th ed. 2024).   Simply put, to "acquire property" contemplates physical action.   Accordingly, PUA § 7-207(b)(3)(iii) and (v) provides that the three classes of entities that *qualify* as having the power of eminent domain—including Maryland electric companies and federal public utilities like PSEG—may exercise that power after the issuance of a CPCN.   The PSC's issuance of a CPCN is a precondition to the exercise of eminent domain by the qualified entities.

This reading of PUA § 7-207(b)(3)(v) is consistent with the reading of PUA § 7-207(b)(3)(i) discussed above.   *See Hollabaugh v. MRO Corp.*, 339 A.3d 188, 194 (Md. 2025) (explaining that courts interpret statutory language "not in isolation but 'within the context of the statutory scheme to which it belongs'" (citation omitted)).   Again, PUA § 7-207(b)(3)(i) states that an electric company or federal public utility may not "*exercise* a right of condemnation" prior to the issuance of a CPCN.   (emphasis added).   The ordinary meaning of "exercise" is "[t]o make use

25

of; to put into action." Exercise, Black's Law Dictionary (12th ed. 2024). Like "acquir[ing] property," "exercise" contemplates physical action.

So, likewise, PUA § 7-207(b)(3)(i) states that an electric company or federal public utility cannot physically act to condemn property pursuant to a "right of condemnation" until a CPCN is issued. It does not say that an electric company or federal public utility lacks eminent domain authority until a CPCN is obtained. In fact, PUA § 7-207(b)(3)(i) indicates the opposite: that a federal public utility has a "right of condemnation," but that right cannot be "exercise[d]" until a CPCN is issued. *See id.* That "right of condemnation" stems from PUA § 7-207(b)(3)(iii), which authorizes federal public utilities to apply for a CPCN in order to exercise the right to construct a high-voltage transmission line.

In short, the plain text of PUA § 7-207(b)(3)(i) and PUA § 7-207(b)(3)(v) point to the same reading: that an electric company or federal public utility cannot physically condemn property until it obtains a CPCN. Neither of these provisions supports Property Owners' claim that the PSC "grants" or creates the power of eminent domain. Rather, each provision contemplates that certain enumerated entities are qualified to exercise the power and places a precondition on its exercise.[4]

---

[4] The Maryland General Assembly has conditioned a condemning authority's "exercise" of the power of eminent domain on the approval of the taking by an independent agency in other contexts. For example, the Maryland State Highway Administration ("SHA") cannot exercise eminent domain unless the State Roads Commission has approved a plat (1) showing the highway's proposed alignment and

26

To avoid this logical reading of PUA § 7-207, the Property Owners insist that, as a statute addressing delegations of eminent domain, PUA § 7-207 should be interpreted strictly in their favor. Property Owners' Br. 25–26. True, courts "strictly construe" statutes granting eminent domain because they are "in derogation of private rights." *Miceli v. Foley*, 575 A.2d 1249, 1263 (Md. App. 1990) (citation omitted). But "while they should be strictly construed, the purpose and intention of the legislature, when clearly manifested in the statute, should not be defeated by any narrow, strained, forced, or artificial construction of its language." *Davis v. Bd. of Educ. of Anne Arundel Cnty.*, 170 A. 590, 591 (Md. 1934). As will be discussed below, the legislative history and underlying purposes for these statutes demonstrate that Property Owners' construction of RP § 12-111(a) and PUA § 7-207(b) would render them unworkable, frustrating the construction of public projects like high-voltage transmission lines.

### C. Legislative History and Intent of the Maryland General Assembly

PSEG's reading of PUA § 7-207 aligns with the statute's legislative history. "The paramount object of statutory construction is the ascertainment and effectuation of the real intention of the Legislature." *Whiting-Turner Contractor Co.*

---

(2) the SHA's estimate of just compensation. Md. Code Ann., Transp. § 8-320; § 8-321. In this context, SHA has the power of eminent domain, but its power is subject to the precondition that the State Roads Commission approve a plat depicting the alignment and the SHA's estimate of compensation. *Id.* §§ 8-320, 8-321.

*v. Fitzpatrick*, 783 A.2d 667, 670 (Md. 2001).  In Maryland, courts read statutory language "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature."  *Mohan*, 289 A.3d at 762 (citation omitted); *see Wheeling v. Selene Fin. LP*, 250 A.3d 197, 209 (Md. 2021) ("A court's primary goal in interpreting statutory language is to discern the legislative purpose[.]" (citation omitted)).

In every version of PUA § 7-207 (and its predecessor statute) from its inception in 1968 until 2015, Maryland electric companies could not "exercise the right of eminent domain" or "exercise the right of condemnation" to construct a high-voltage transmission line without first obtaining a CPCN.  1968 Md. Laws Ch. 493 (S.B. 22) (codifying Art. 78 § 54A) ("No electric company may begin the construction in Maryland of . . . any overhead transmission line designed to carry a voltage in excess of 69,000 volts, or exercise the right of eminent domain in connection therewith, without having first obtained" a CPCN); 1998 Md. Laws Ch. 8 (S.B. 1) (codifying PUA § 7-207(b)) ("An electric company may not begin construction . . . of an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts, or exercise the right of condemnation in connection with the construction, unless [a CPCN] is first obtained [.]"); 1999 Md. Laws Ch. 3 (S.B. 300) (amending PUA § 7-207(b)) ("Unless a [CPCN] is first obtained . . . an electric company may not begin construction of an overhead transmission line that is

designed to carry a voltage in excess of 69,000 volts or exercise a right of condemnation with the construction."). Thus, the General Assembly always provided that an entity eligible to obtain a CPCN had the "right" of eminent domain (or condemnation), but the exercise of the right was preconditioned—it could not be "exercise[d]" until a CPCN issued. *See Bouton v. Potomac Edison Co.*, 418 A.2d 1168, 1169 (Md. 1980) ("[A CPCN] is a prerequisite to the *exercise* of the Company's right of eminent domain." (emphasis added)); *accord Cnty. Comm'rs of Frederick Cnty. v. Schrodel*, 577 A.2d 39, 47 (Md. 1990) (describing the CPCN as a "precondition[] on a utility's exercise of eminent domain power"); *Potomac Elec. Power Co. v. Montgomery Cnty.*, 560 A.2d 50, 54 (Md. App. 1989) ("[B]efore a public utility may begin construction of this type of transmission line, 'or exercise the right of eminent domain in connection therewith,' it must first obtain a [CPCN] from the PSC." (citation omitted)).

Until 2015, only Maryland electric companies could apply for a CPCN, construct transmission lines, and exercise eminent domain in connection with that construction. *See* Fiscal and Policy Note, S.B. 460, at 2–3 (2015). In 2015, the General Assembly amended PUA § 7-207(b) to enable federal public utilities to do the same. 2015 Maryland Laws Ch. 174 (S.B. 460). Importantly, the General Assembly kept the same statutory language that it had used previously to describe when a federal public utility could "exercise" its "right of condemnation" to

29

construct a high-voltage transmission line. *Id*. The Fiscal and Policy Note stated that the purpose of the 2015 legislation was to ensure that such federal public utilities may "exercise a right of condemnation" to obtain property necessary for the construction. *See* Fiscal and Policy Note, S.B. 460, at 2–3 (2015).

In 2017, the General Assembly added PUA § 7-207(b)(v), which expanded on the description of the exercise of condemnation authority to provide that a person under PUA § 7-207(b)(3)(iii) (*i.e.*, a Maryland electric company or federal public utility) may acquire property by condemnation in accordance with Title 12 of the Real Property Article. 2017 Md. Laws Ch. 840 (S.B. 969). Because the General Assembly, in 2015, had already expanded the right to exercise eminent domain authority to federal public utilities, the 2017 amendments were not a substantive change in the law. "[W]hen an amendment alters, even 'significantly alters,' the original statutory language, this does 'not necessarily' indicate that the amendment institutes a change in the law." *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (citations omitted); *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 632 (D. Md. 2015) ("[S]tatutes may be passed purely to make what was intended all along even more unmistakably clear." (citation omitted)); *see also Cunningham v. Feinberg*, 107 A.3d 1194, 1217 (Md. 2015); *Johnson v. Mayor of Balt.*, 61 A.3d 33, 44–45 (Md. 2013).

Property Owners misconstrue the legislative history in their attempt to argue otherwise. First, they insist that, in 2017, the General Assembly gave the PSC the authority to grant the power of eminent domain. Property Owners' Br. 16–17. This is incorrect. As described above, the General Assembly authorized federal public utilities to exercise eminent domain authority in 2015, codified as PUA § 7-207(b)(3)(i)-(iii). At that time, the General Assembly imposed a precondition on the exercise of eminent domain, making clear that the "right of condemnation" could not be exercised until a CPCN issued, just as the same "right" possessed by Maryland electric companies since the first version of the statute in 1968 was also limited. Fiscal and Policy Note, S.B. 460, at 1 (2015). Property Owners ignore this language—and its history—entirely.

Second, Property Owners point to the PSC's comments on the 2017 bill file, noting that the PSC believed that it had the power to grant eminent domain authority. Property Owners' Br. 18. But statutory interpretation turns on the legislature's intentions, not an agency's comments. *Town of Forest Heights v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 205 A.3d 1067, 1079 (Md. 2019) ("When attempting to ascertain legislative intent, this Court focuses on the specific intent of the General Assembly and not the intent of witnesses supporting or opposing a particular piece of proposed legislation."); *see also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) ("[W]e can all agree that 'excerpts from committee hearings'

31

are 'among the least illuminating forms of legislative history.'" (citation omitted)). And, as discussed in Section II.B., above, nothing in PUA § 7-207(b)(3)(v) states—expressly or otherwise—that entities are "granted" the power of eminent domain on issuance of a CPCN.

Indeed, it is the General Assembly, not the PSC, that has the authority to grant or delegate the power of eminent domain. *See, e.g.*, *Zografos v. Mayor of Balt.*, 884 A.2d 770, 779 (Md. App. 2005) ("[T]he General Assembly has exclusive discretion over 'the mode and manner of the exercise of the power of eminent domain.'" (citation omitted)); *accord City of Balt. Dev. Co. v. Carmel Realty Assocs.*, 395 Md. 299, 315 (Md. 2006); *J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 792 A.2d 288, 297 (Md. 2002) ("[T]he 'mode and manner of the exercise of the power' of eminent domain, however, 'is exclusively vested in the judgment and discretion of the Legislature[.]'" (citation omitted)). The General Assembly holds the power of eminent domain as an essential attribute of sovereignty and may grant it. *See, e.g., Mayor of Baltimore City v. Valsamaki*, 916 A.2d 324, 335 (Md. 2007) (citation omitted). So, the General Assembly enacts legislation in which it makes the policy judgment as to what entity should hold the power. In contrast, the PSC's role in a CPCN proceeding is to determine whether to approve a specific electric transmission line and, if so, decide the appropriate alignment for the line.

Accordingly, whether the PSC believed that the 2017 amendments gave it the power to grant eminent domain authority is irrelevant.

### D. Interpreting the Statutory Scheme to be Workable

Interpreting PUA § 7-207(b)(3)(i)-(iii) to delegate the power of eminent domain to PSEG—and therefore qualify as "having the power of eminent domain" under RP § 12-111—is the only way to effectuate the General Assembly's intent to allow Maryland electric companies and federal public utilities to construct high-voltage transmission lines and exercise eminent domain in connection with their construction. In Maryland, courts apply a "commonsensical" approach to statutory interpretation, *Lawrence v. State*, 257 A.3d 588, 601 (Md. 2021), pursuing a reading "that is consonant with logic and common sense." *Twigg v. State*, 133 A.3d 1125, 1139 (Md. 2016). Related provisions must be "read together and harmonized to the extent possible," as the "Legislature intends its enactment to operate together as a consistent and harmonious body of law." *Andrews & Lawrence Prof'l Servs., LLC*, 223 A.3d at 960, 968 (citations omitted). And, "[i]n every case," statutory language "must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 287 A.3d 271, 293 (Md. 2022) (citation omitted).

PSEG's interpretation of RP § 12-111 and PUA § 7-207 is the only one that makes the Maryland process for the approval and construction of high-voltage

electric transmission lines workable. When a Maryland electric company or federal public utility applies for a CPCN to construct a high-voltage transmission line, every application must offer a "description of the physical, biological, aesthetic, and cultural features" of the project site, as well as several impact statements and studies. COMAR 20.79.04.04A; COMAR 20.79.01.06K. The PSC must consider these factors in deciding whether to award a CPCN and in establishing an appropriate alignment. PUA § 7-207(e)–(f). The access rights afforded by RP § 12-111 play an important role in this process. RP § 12-111 is the vehicle available to Maryland electric companies and federal public utilities to obtain the environmental survey information that the PSC has now required PSEG to obtain for PPRP's review of the MPRP's CPCN application.

Property Owners interpret RP § 12-111(a) to mean that PSEG can "have[] the power of eminent domain" only after all preconditions to the exercise of eminent domain set forth in PUA § 7-207(b) (i.e., the receipt of a CPCN) have been satisfied. Property Owners' Br. 14–19. But this interpretation makes RP § 12-111 ineffective to accomplish its legislative purpose. Surveys under RP § 12-111(a) are "necessary for determining whether 'that particular piece of property should be taken.'" *King*, 447 A.2d at 122. Maryland law requires CPCN applicants for transmission lines to provide certain environmental information to be considered by the PSC as part of the CPCN process. COMAR 20.79.04.04A; COMAR 20.79.01.06K. And PPRP is

34

required to review a proposed project's environmental impacts and make recommendations to the PSC for proposed CPCN licensing conditions. NR § 3-306. The surveys contemplated by RP § 12-111 are therefore used by CPCN applicants and PPRP to further the goals of the CPCN review process to obtain the PSC's approval.

As such, there is only one logical interpretation of RP § 12-111(a) and PUA § 7-207: Maryland electric companies and federal public utilities have the power to construct high-voltage transmission lines and exercise eminent domain under Maryland law. Therefore, they may conduct surveys relating to that future public use, but they must obtain a CPCN as a precondition to ultimately exercising eminent domain.[5] And, to be a body corporate having the power of eminent domain under RP § 12-111(a), an entity does not have to satisfy all preconditions to the exercise of eminent domain. This interpretation satisfies the General Assembly's intent to allow Maryland electric companies and federal public utilities to obtain a CPCN to construct power lines and exercise eminent domain in connection with that

---

[5] Moreover, RP § 12-111 is a century-old codification of a common law privilege that existed before the advent of CPCNs. *See* Md. Laws Ch. 649 (1916); *Steuart v. City of Balt.*, 7 Md. 500, 516 (1855) ("The constitutional prohibition against taking private property for public use . . . does not mean the preliminary measures necessary in such cases."). "Today, every state has codified the common law privilege of a body exercising eminent domain authority to enter private property to conduct preliminary surveys." *Palmer v. Atl. Coast Pipeline, LLC*, 801 S.E.2d 414, 418 (Va. 2017); *see also id.* at 418 n.2 (collecting fifty state statutes).

35

construction. It also satisfies the General Assembly's intent to allow preliminary surveys in connection with a proposed public project to determine the nature and scope of the project. A contrary interpretation that requires an applicant to already hold a CPCN before it may collect the survey data that state agencies must review would render the entire scheme unworkable.

Indeed, Property Owners' interpretation would allow any individual landowner to indefinitely stymie a CPCN application and the construction of a high-voltage transmission line. The right of action provided by RP § 12-111(b) permits entities to do what PSEG has done here: obtain a court order preventing private landowners from obstructing land surveys. *See King*, 447 A.2d at 123 (noting that the purpose of RP § 12-111(b) "is to bring a recalcitrant landowner under the contempt power of the court"). That concern is manifest here. PPRP has repeatedly stated that it requires PSEG to conduct these field surveys to ascertain the environmental and socioeconomic impact of the MPRP before PPRP can provide the PSC with its recommendations regarding the project. *E.g.*, JA0255–61. Since this appeal was filed, the PSC has also confirmed that it "cannot compromise PPRP's ability to conduct its review of the [CPCN] Application" and therefore has implemented a procedural schedule in that proceeding that "is subject to amendment should PSEG be unable to provide its field studies to PPRP in time to allow the parties to include them in their Direct Testimony." *See* Procedural Schedule 6, 7

36

n.20 (finding the PPRP cannot discharge its statutory duties "without the required field surveys"). PSEG would be powerless to collect this data if it could not seek an order under RP § 12-111(b), leaving the CPCN review process at the mercy of individual Property Owners. Such a result would be "incompatible with common sense." *Comptroller of Md.*, 287 A.3d at 293 (citation omitted).

Property Owners insist PPRP has other ways to obtain the data it needs. Property Owners' Br. 20–22. PPRP has a separate right to enter private property to conduct "environmental and engineering studies" related to high-voltage transmission lines. NR § 3-305(f)(1). But, because PSEG does not transmit or distribute electricity in Maryland, it is not an "electric company" that can request that PPRP exercise this authority. NR § 3-305(f)(1) (permitting "an electric company" to submit a "written request" to PPRP); PUA § 1-101(i)(1) (defining "electric company" as an entity that "transmits or distributes electricity in the State to a retail electric customer"). No provision of law requires PPRP to conduct surveys of its own accord, and PPRP may not have the necessary appropriation or resources to do so. Regardless, it is PSEG—not PPRP—that has been asked to conduct these surveys so PPRP can perform its analysis and provide recommendations to the PSC.

In sum, PSEG's reading of RP § 12-111 and PUA § 7-207 effectuates the intent of the Maryland General Assembly by permitting qualified entities with pending CPCN applications to collect information requested by state agencies so

37

those agencies can conduct their evaluation of the proposed line. The District Court's ruling gives full effect to the statutory language and the legislative purpose of both statutes, and it avoids a result in which an important public project is stymied. Therefore, the District Court did not abuse its discretion in finding that PSEG "made a strong showing that it is likely to succeed on the merits." JA2512.

### III.    The District Court Did Not Abuse its Discretion to Conclude That PSEG Would be Irreparably Harmed Absent Preliminary Injunctive Relief.

The District Court properly applied controlling precedents and weighed the parties' factual averments to conclude that "PSEG has shown irreparable harm sufficient to justify issuance of a preliminary injunction." JA2515. As this Court has recognized, the construction of a public utility project such as a high-voltage transmission line is a lengthy and complex process, often delineated in stages. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004); *Mountain Valley*, 915 F.3d at 217. Obstruction at any one stage can hinder—if not derail—an entire project. *See Sage*, 361 F.3d at 829 (recognizing that "any single parcel has the potential of holding up the entire project"); *Mountain Valley*, 915 F.3d at 217 (same).

Before the District Court issued the Preliminary Injunction, Property Owners were effectively "holding up the entire [MPRP] project" by refusing to allow PSEG to exercise its statutory right of entry. *Cf. Sage*, 361 F.3d at 829; *see* JA0301–713,

1753–89 (documenting Property Owners' refusals to negotiate voluntary access). As a result, PSEG could not obtain survey data required by PPRP and the PSC to evaluate the project. JA0255–61. Property Owners were thereby preventing PSEG's CPCN application from proceeding to the next stage in the CPCN review process and stagnating the project absent court intervention. JA0148–52 (describing exigent need for access to conduct required field surveys).

Accordingly, absent preliminary relief, PSEG would be trapped in purgatory—unable to obtain the survey data necessary for PPRP and the PSC to review its CPCN application. JA2515; *see also supra* Section II.D. And injunctive relief is warranted where such delays and stagnation would result in irreparable harm. *Sage*, 361 F.3d at 829; *Mountain Valley*, 915 F.3d at 217 ("[W]ithout an injunction, Mountain Valley likely would lose the right to construct the pipeline altogether—an outcome that qualifies as irreparable injury[.]").

PSEG presented evidence of cascading consequences that would flow from Property Owners' continued obstruction while awaiting a trial on the merits. Absent preliminary injunctive relief, Property Owners' conduct was virtually guaranteed to delay the CPCN review process long enough to force PSEG to miss PJM's in-service date. JA0147–50. Because PPRP requires the survey data to conduct its review of PSEG's CPCN application, the application would have been delayed until a trial on the merits could confirm PSEG's right of access. *See* JA0147–50. Evidence before

the District Court demonstrated that the months-long delay caused by waiting for a final determination on the merits would have prevented PSEG from meeting its contractual in-service date under the DEA with PJM.  *See* JA0149–50; JA0157–82 (DEA with PJM).   Accordingly, "without preliminary relief, [PSEG] almost certainly would be unable to meet [PJM's June 2027] in-service deadline." *Mountain Valley*, 915 F.3d at 216.

PJM's in-service date is when PJM forecasts regional electrical instability will reach a dangerous level without the MPRP's construction and operation.  *See* JA0145–46 (explaining risks forecast by PJM).  Because Property Owners' conduct threatened to derail the MPRP, it also threatened the continuing stability of the regional electric grid.  JA0145–46.  This is a public utility construction case in which the absence of preliminary relief is not only likely—but virtually guaranteed—to stall or thwart a necessary public improvement.

Property Owners argue the MPRP may never materialize, so any harms that flow from the delay are speculative.  Property Owners' Br. 35-40.  No large public project can be certain of completion.  But if an electric company or federal public utility is barred from conducting the surveys deemed necessary for the reviewing state agencies to evaluate an electric transmission line, the project cannot proceed. Under Property Owners' view, any discontented landowner along a proposed public improvement can exercise a veto power over public projects, and the courts would

40

be powerless to intervene until a full trial on the merits—by which time the development may already be abandoned or doomed to miss critical milestones. This view fails to recognize the way public utility construction projects work; they are completed in stages, and delays in any one stage can cause irreparable harm. *Sage*, 361 F.3d at 829 (recognizing irreparable harm where landowner delays would force a pipeline developer to breach its contracts); *Mountain Valley*, 915 F.3d at 217.

Second, *Mountain Valley* and *Sage* continue to be the most salient authorities within this Circuit supporting PSEG's irreparable harm, and the District Court was correct in relying upon them. *See* JA2513–15. Property Owners argue that both cases are distinguishable, as those companies had obtained CPCNs from FERC and were beginning condemnation proceedings. Property Owners' Br. 43–44; *see also* JA2514–15. But *Mountain Valley* and *Sage* do not require that a public project be guaranteed to be constructed before a preliminary injunction may issue. That is not and has never been the standard. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that he is *likely* to suffer irreparable harm in the absence of preliminary relief[.]" (emphasis added)); *Pashby*, 709 F.3d at 328–29 (rejecting appellant's argument that appellees "failed to show irreparable harm because none of them proved that they were certain to suffer injury as a result" of the challenged conduct). Rather, *Mountain Valley* and *Sage* recognized that the delays of condemnation proceedings were likely to stymie the construction of the

41

respective projects and imperil the companies' abilities to meet in-service deadlines. *Mountain Valley*, 915 F.3d at 216–17; *Sage*, 361 F.3d at 828–29. The same is true here, where the evidence demonstrated that delays in survey access were likely to delay or stymie the construction of the MPRP and, by extension, PSEG's ability to meet its in-service deadline.[6]

To that end, it is immaterial whether the MPRP might be delayed for other reasons. Without the ability to conduct the required surveys, PSEG's application would not be able to move forward in order to meet PJM's in-service deadline to address deficiencies in the electrical grid. In *Mountain Valley* and *Sage*, this Court

---

[6] Property Owners point to the PSC's Procedural Schedule, entered four months after the preliminary injunction issued, and ask the Court to rule upon its legal implications even though it was not a fact before the district court. Property Owners' Br. 7, 36–39. This request contravenes the general rule that an appellate court "does not consider evidence that was not before the district court." *Wright v. Sw. Airlines*, 319 F. App'x 232, 234 n.2 (4th Cir. 2009); *Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir. 2000) ("From a procedural standpoint, courts hearing a case on appeal are limited to reviewing the record that has been developed below."); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 357 (4th Cir. 2021) (Wilkinson, J., dissenting) ("Instead of asking us to reverse the district court's earlier denial of a preliminary injunction, the plaintiffs should be before the district court seeking relief based on the changed circumstances."). While the Court may take judicial notice of the existence of the PSC's Procedural Schedule, it can hardly be said the District Court abused its discretion and committed clear error based on facts that did not yet exist. In any event, the Procedural Schedule confirms that PSEG will suffer irreparable harm absent relief because "PPRP[] need[s] to perform its statutorily required evaluation of the Application, which it cannot do without the required field studies." *See* Procedural Schedule 5–6. The PSC's order confirms that if PSEG cannot proceed with the required surveys, the PSC process will be at a standstill, and PSEG will not be able to fulfill its contractual obligation to PJM to construct the MPRP.

upheld the issuance of a preliminary injunction because the Court was concerned with the harm resulting from delays to utility access to properties. *See Mountain Valley*, 915 F.3d at 216–17; *Sage*, 361 F.3d at 828–29. The same circumstances exist here.

Indeed, Property Owners' argument has been rejected elsewhere. For instance, in *Transcontinental Gas Pipe Line Co. v. 6.04 Acres*, the defendants argued that a pipeline developer, Transcontinental, failed to show irreparable harm "because a 'multitude of other potential or actual factors' could have also potentially affected Transcontinental's ability to meet its in-service deadline." 910 F.3d 1130, 1165 (11th Cir. 2018). The Eleventh Circuit rejected that argument, explaining that "[t]he preliminary injunction in this case is concerned with avoiding harm caused by an *inability to access Defendants' properties*, not with the possibility that future delay could conceivably occur based on other factors that might never occur." *Id.* (emphasis added); *see also Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty.*, 540 F. Supp. 3d 1291, 1318 (S.D. Ga. 2021) (rejecting defendants' argument that "*other* factors could delay" a plaintiff's permit issuance, relying on *Transcontinental* (emphasis in original)); *In re Tenn. Gas Pipeline Co. Litig.*, No. 3:24-cv-00469, 2025 WL 1336322, at *3 (M.D. Tenn. May 6, 2025) (relying on *Transcontinental* to hold a developer "will suffer irreparable harm as a result of the additional delay and

43

expense that would flow from its inability to meet its construction schedule and contractual supply requirements").

Property Owners rely on *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1991), and *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litigation)*, 333 F.3d 517 (4th Cir. 2003), two cases involving alleged Sherman Act violations where plaintiffs sought preliminary injunctions because they feared that defendants would break into a new economic market first. *See Direx*, 952 F.2d at 804 (involving preliminary injunction to enjoin competitor from releasing inexpensive medical device based on trade secrets from former employee); *Microsoft Corp.*, 333 F.3d at 521 (involving plaintiff who feared defendant would break into emerging "middleware" software field and gain a market "tipping" advantage). These cases have no relevance here. In both cases, the defendant-competitor had not taken any affirmative steps to enter into the market in question. *Direx*, 952 F.2d at 815–16; *Microsoft Corp.*, 333 F.3d at 528. Here, in contrast, Property Owners' refusals of access were stymying PPRP's and the PSC's review of the project. The harm of delay had already materialized and was compounding with the passage of time. *See* JA0301–713, JA1753–89 (indicating that contacting and attempting to negotiate access with Property Owners took "several months"); *see also* JA2444 (indicating Property Owners requested "three to four months of discovery" before issuance of an injunction); JA0255–61, JA2521–

22 (indicating Property Owners' efforts to obstruct access resulted in an additional three-month delay from March 2025, when PPRP indicated field surveys were required, to June 2025, when the preliminary injunction issued). The harm caused by compounding delays in a public project's administrative approval process is nothing like the speculative fear that a competitor might at some point sell a product first.

The District Court paid particular attention to the monetary harms that would flow from these compounding delays, specifically in the form of delays in construction of the MPRP, and PSEG's inability to meet PJM's in-service date. JA2515-16. The financial losses would be irrecoverable in any future proceedings, just like in *Mountain Valley*. 915 F.3d at 218. If the MPRP is stymied, or even delayed, PSEG will lose the ability to charge rates established by FERC to recover PSEG's actual reasonable costs and a reasonable rate of return. Although the precise amount of these losses cannot be calculated, the fact that the losses will occur is manifest.

Property Owners argue that the District Court lacked evidentiary support for concluding there would be losses of revenue due to delays. Property Owners' Br. 41–42. But it is self-evident that a private company will lose future revenue if it loses the ability to construct a transmission line and earn an approved rate of return, and district courts are capable of drawing reasonable conclusions from the evidence.

*See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (holding district court's factual findings based on "documentary evidence or inferences from other facts" were not clearly erroneous as "the district court's account of the evidence [wa]s plausible in light of the record viewed in its entirety"). Indeed, the record evidence below confirmed PSEG's business expectation of future revenue. *See* JA0151. There is no clear error in the District Court's common sense factual conclusion considering "the record viewed in its entirety." *Anderson*, 470 U.S. at 573–74.

Finally, and in addition to the harms described above, PSEG would also be irreparably harmed absent preliminary relief because RP § 12-111 grants PSEG a substantive entitlement to enter Property Owners' properties and conduct the sort of surveys required by PPRP. A plaintiff is irreparably harmed when it has lost or will lose a right that is codified and guaranteed by statute, the loss of the right is not compensable in any future proceeding, and the plaintiff has no way of otherwise restoring the lost right. *See Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39, 48, 50 (D.S.C. 2018) (granting preliminary injunction enjoining state health department from terminating Medicaid enrollment of Planned Parenthood; holding that "[t]he Court has no trouble concluding Ms. Edwards would suffer irreparable harm in the absence of a preliminary injunction because she would be deprived of her statutory right [under 42 U.S.C. § 1396a(a)(23)(A)] to select the qualified and

46

willing provider of her choice"), *aff'd* 941 F.3d 687, 707 (4th Cir. 2019); *Continental Resources, Inc. v. Langved*, No. 4:15–cv–19, 2015 WL 686965, at \*5 (D.N.D. Feb. 18, 2015) (where company had statutory right to access and drill on private property, company was likely to suffer irreparable harm if landowner continued to bar access to property); *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 289 F.Supp.3d 73, 75–76 (D.D.C. Jan. 29, 2018) (granting preliminary injunction that required agency to comply with Sunshine Act's notice requirements under 49 U.S.C. § 14504a(d)(4)(D) before convening subcommittee meetings, noting "[t]he harm th[at] follows from [the lack of notice] is both obvious and certain: Plaintiffs cannot exercise their statutory right to attend and participate in subcommittee meetings that they do not know about.").

Property Owners' refusal to permit PSEG's entry without delay prevented the Company from freely exercising its statutory right under RP § 12-111, and the Company's only available remedy is to obtain "an order directing that the person be permitted to enter." RP § 12-111(b). Absent an immediate injunction, the Company's statutory right of entry would have been fully obstructed, with no other recourse available, leaving PSEG irreparably harmed. The Preliminary Injunction is thus also supported on this basis.

**IV.    The District Court Did Not Abuse its Discretion to Conclude That the Balance of Equities Favored Issuance of the Preliminary Injunction.**

A balancing of the equities decisively favors upholding the District Court's issuance of the Preliminary Injunction. "To balance the equities, the Court considers 'the relative harms to the applicant and respondent, as well as the interest of the public at large.'" *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 288 (D. Md. 2025) (quoting *Barnes v. E-Sys., Inc. Grp. Hosp. Med & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers)). Here, the equities favor PSEG, as both PSEG and the public face grave and irreparable harms in the absence of preliminary relief, while Property Owners face no material harm from limited, minimally invasive field surveys.

The District Court appropriately weighed the significant harm that results from delays and obstruction to necessary public infrastructure projects like the MPRP against Property Owners' minimal and redressable injuries. *See* JA2516–17. Property Owners argue that the balance should tip in their favor because the Preliminary Injunction (1) authorized a *per se* temporary physical taking, and (2) permits "unfettered access" that will harm individual Property Owners. Neither argument has merit.

48

## A. The Preliminary Injunction Does Not Authorize a *Per Se* Temporary Physical Taking

Property Owners' argument rests on a fundamental misunderstanding regarding the right to exclude. The right to exclude is not absolute and, as the Supreme Court explained in *Cedar Point Nursery v. Hassid*, there are certain "background restrictions" on property rights recognized by common law. 594 U.S. 139, 160 (2021). "The government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title.'" *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028–29 (1992)). In other words, one cannot "take" a property right that was not part of the Property Owners' bundle of rights in the first instance. *See, e.g.*, *id.* at 161 (noting common law recognized a property owner had no right to exclude a police officer engaged in a reasonable search or arrest).

The first Restatement of Torts lists many of these pre-existing limitations that existed at common law, including the right of a government to enter onto private property for purposes of conducting surveys preliminary to the exercise of eminent domain. Restatement of Torts § 211 (1934). The Restatement provides that, if a "legislative enactment" creates a "duty or authority" to enter another's land, an actor is privileged to enter that land "in so far as the entry is reasonably necessary to such performance or exercise." *Id.* "Today, every state has codified th[is] common law principle" into law. *Palmer v. Atl. Coast Pipeline, LLC*, 801 S.E.2d 414, 418 & n.2

49

(Va. 2017) (collecting statutes).  RP § 12-111 is Maryland's codification of this common law principle.  *See id.*  Facial challenges to these codified right of entry statutes as violative of the Takings Clause have unanimously been unsuccessful. *See*, *e.g.*, *Charlottesville Div. v. Dominion Transmission Inc.*, 138 F. Supp. 3d 673, 688–94 (W.D. Va. 2015); *Summit Carbon Sols., LLC v. Kasische*, 14 N.W.3d 119, 126–30 (Iowa 2024) (quoting *Cedar Point Nursery*, 594 U.S. at 149); *SCS Carbon Transp. LLC v. Malloy*, 7 N.W.3d 268, 277–80 (N.D. 2024); *Betty Jean Strom Tr. v. SCS Carbon Transp., LLC*, 11 N.W.3d 71, 91–95 (S.D. 2024).  This common law right has been held to apply to public utility companies in the application process for CPCN approval where such surveys are necessary for the application.  *See Barr v. Atl. Coast Pipeline, LLC*, 815 S.E.2d 783, 784, 790–92 (Va. 2018) (upholding court order granting a natural gas company permission to enter certain properties to conduct necessary preliminary surveys based on this common law principle).

Without going so far as to argue that RP § 12-111 is unconstitutional, Property Owners nonetheless argue the Preliminary Injunction permits an unlawful taking. Property Owners' Br. 47–50.  Property Owners cite no persuasive authority in support.  *Reichs Ford Rd. Joint Venture v. St. Rds. Comm'n of the St. Highway Admin.*, 880 A.2d 307 (Md. 2005), held that under a 1962 amendment to a Maryland condemnation law, a diminution in fair market value of property caused by pre-condemnation activity of the condemning authority is recoverable in a condemnation

50

case. *Reichs*, 880 A.2d at 318–20. *J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Planning Comm'n*, 792 A.2d 288 (Md. 2002), held that until condemnation occurs, a landowner cannot be enjoined from developing his property merely because a condemning authority has indicated an intent to initiate condemnation proceedings in the future. *Id.* at 307 n.28. Neither case creates a requirement for compensation prior to formal condemnation proceedings. And neither case addresses the common law principle that a right of entry for purposes of preliminary surveys exists and that no compensation is owed for the entry.

### B. The Preliminary Injunction's Consistency with Common Law Rights of Entry

As noted above, the Preliminary Injunction permits PSEG to conduct surveys that are authorized by RP § 12-111. JA2547–48. The statute only permits—and the Preliminary Injunction only authorizes—"innocuous and temporary [intrusions] effecting only minimal incidental damage and little, if any, disturbance." *Mackie v. Mayor of Elkton*, 290 A.2d 500, 504 (Md. 1972). There is no error in the District Court's recognition that Property Owners would be minimally harmed by such "innocuous and temporary" intrusions. *See id.* This is particularly true where the right of recovery for any incidental damage is built into the injunction and statute. RP § 12-111(c); *see* JA2517.

Additionally, Property Owners moved to amend the Preliminary Injunction but did not seek any modifications to address the issues they now raise. *See* Resp'ts'

Mem. in Supp. of Mot. to Stay Prelim. Inj., *PSEG Renewable Transmission LLC v. Arentz LP*, at 13, 2025 WL 1919947 (D. Md. July 11, 2025) (No. 25-cv-1235), ECF 258-1 (requesting only that the Court "clarify its narrow scope" by expressly limiting PSEG's access rights to "non-invasive survey on a temporary and limited basis"). Even now, on appeal, exactly what limitations the Property Owners desire remains a mystery. Any complaints about the scope of the Preliminary Injunction are thus waived. *See Real Time Med. Sys., Inc.*, 131 F.4th at 223 (holding "[t]he Court may deem an argument not properly before [the Court] if the defendant fails to sufficiently raise it before the district court or in its opening brief").

Finally, many of the harms alleged by Property Owners are incidental to the construction of the MPRP itself—not the preliminary surveys. *See* JA1961 (noting concerns about passing farms down to children one day); JA1969 (discussing property's family history and sentimental value). Factors relating to the amount of compensation to which Property Owners may claim in a condemnation case are not a proper basis for contesting the issuance of the Preliminary Injunction, which is concerned only with limited preliminary surveys. *See Mountain Valley*, 915 F.3d at 215 (noting landowner's alleged harms to the "productive capacity" of land would flow from the construction of the pipeline, not from the issuance of the preliminary injunction).

52

In sum, the balance of equities weighs in favor of the Preliminary Injunction's issuance. While PSEG and the public will experience severe and irreparable harm from denials of survey access, the Property Owners have failed to establish material harm beyond the annoyance associated with the State's eminent domain processes, which "is properly treated as part of the burden of common citizenship." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 237 (2003) (citation omitted).

## V. The District Court Did Not Abuse Its Discretion to Conclude That the Issuance of the Preliminary Injunction Was in the Public Interest.

The District Court did not abuse its discretion when it held the issuance of the Preliminary Injunction was in the public interest because the public has a profound interest in a functional electric grid. The prospect of PJM's forecasted blackouts and service interruptions absent a preliminary injunction heavily weighs in favor of a preliminary injunction.

The District Court correctly relied on *Mountain Valley* and *Sage* for the general principle that advancements of public infrastructure are generally in the public interest. JA2518. Consistent with this Court's admonition in *Mountain Valley* that an injunction never be awarded as of right, 915 F.3d at 222, the District Court evaluated the unique interests of the public in this case, paying particular attention to the need expressed by public agencies for the environmental surveys. *See* JA2518. The District Court correctly found that in this case, PPRP, which

53

represents seven Maryland agencies (who, in turn, represent the public's interests), indicated that these surveys are necessary to evaluate whether the MPRP's proposed route is in the public interest. JA2518 (citing NR § 3-303). Contrary to Property Owners' contention that PPRP merely "posited" that PSEG's CPCN Application is incomplete for want of certain surveys, Property Owners' Br. 54, PPRP has clearly expressed the need for the studies. *See* JA0258 ("Field studies are imperative to verify and augment initial desktop information to confirm that the Project's effects are correctly documented, ensuring that all unavoidable impacts are accurately evaluated and that appropriate mitigation is proposed."); JA0258 ("Without field-based information, PPRP cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources." (footnote omitted)); JA0258 ("[T]he field-based studies listed below are necessary[.]"). And, as noted by Property Owners and above, the PSC has recently affirmed that PPRP's requested studies are required for PPRP's analysis. *See* Procedural Schedule 5–6 ("PPRP[] need[s] to perform its statutorily required evaluation of the Application, which it cannot do without the required field studies.").

Additionally, the District Court received evidence that not only did PPRP find that it needed the surveys, but each affected County agreed with PPRP in comments filed with the PSC. *See* JA1718–20 (comments from the Director of the Carroll County Department of Planning and Land Management); JA1722–25 (comments

from the Office of the County Attorney for Frederick County); JA1728–32 (comments from Baltimore County); *see also In re Application of PSEG Renewable Transmission LLC*, Case No. 9773, Filing No. 611, at 1 (Md. Pub. Serv. Comm'n Aug. 14, 2025) (publishing comments from Carroll County in opposition to PSEG's proposed schedule because "[t]he environmental assessment that PSEG is required by PPRP to conduct has not yet been completed, including the site surveys and analyses").

Furthermore, at least thirteen of the Property Owners in this suit also filed comments with the PSC indicating that the surveys are necessary and that the application should not move forward without them. *See* PSEG's Mem. in Supp. of Mot. for Prelim. Inj. at 6 n.4, *PSEG Renewable Transmission LLC v. Arentz LP*, 2025 WL 1919947 (D. Md. July 11, 2025) (No. 25-cv-1235), ECF No. 105-1 (directing District Court to the electronic docket containing these comments); *see, e.g.*, *In re Application of PSEG Renewable Transmission LLC*, Case No. 9773, Filing No. 592, at 1 (Md. Pub. Serv. Comm'n Aug. 13, 2025) (letter from Appellees Charles and Morgan Bond). These Property Owners, in addition to Carroll County as Amici, should not be heard to argue the opposite position in this proceeding.

Moreover, the District Court was correct to not credit the Property Owners' speculative arguments that the MPRP itself is not necessary. JA2518. PJM is the regional transmission organization that has been delegated the responsibility to

55

determine regional electric needs. *See* JA0158. To the extent circumstances change during the course of a proposed project, PJM is the entity that determines continuing need. *See* JA0164 (noting PJM can terminate the DEA if the project is "no longer required"). In fact, as the Third Circuit recently held, a state public service commission cannot, consistent with the Supremacy Clause, second-guess a regional transmission organization's determination of need. *Transource Pa., LLC v. Defrank*, --- F.4th ---, No. 24-1045, 2025 WL 2554133, at *19 (3d Cir. Sep. 5, 2025). The District Court was correct to defer to PJM's expertise.

## <u>CONCLUSION</u>

This Court should affirm the District Court's entry of the Preliminary Injunction.

Respectfully submitted,

*/s/ Kurt J. Fischer*
Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street

56

Suite 900
Baltimore, MD 21202
(410) 244-7400
klthompson@venable.com
csgunderson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Appellee PSEG*
*Renewable Transmission LLC*

## **REQUEST FOR ORAL ARGUMENT**

Appellee respectfully requests oral argument pursuant to Local Rule 34(a).

## <u>CERTIFICATE OF COMPLIANCE</u>

     1.     Appellee's brief complies with the type volume limitations of Fed. R. App. P. 28(a) and 32(a) because it contains 12,905 words, excluding the parts exempted by Rule 32(f).

     2.     Appellee's brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point Times New Roman font.

  <i>/s/ Emily J. Wilson</i>             
Emily J. Wilson
Counsel for Appellee

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 16th day of October, 2025, a copy of the foregoing was filed and served through the CM/ECF system on all counsel of record, who are registered CM/ECF users.

*/s/ Emily J. Wilson*
Emily J. Wilson
Counsel for Appellee

# ADDENDUM – PERTINENT STATUTES
## Pursuant to Fed. R. App. P. 28(f)

## Md. Code Ann., Real Prop. §12-111

**(a)** Civil engineers, land surveyors, real estate appraisers, and their assistants acting on behalf of the State or of any of its instrumentalities or any body politic or corporate having the power of eminent domain after every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry may:

    **(1)** Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;

    **(2)** Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and

    **(3)** Enter on any private land and perform any function necessary to appraise the property.

**(b)** If any civil engineer, surveyor, real estate appraiser, or any of their assistants is refused permission to enter or remain on any private land for the purposes set out in subsection (a) of this section, the person, the State, its instrumentality, or the body politic or corporate on whose behalf the person is acting may apply to a law court of the county where the property, or any part of it, is located for an order directing that the person be permitted to enter on and remain on the land to the extent necessary to carry out the purposes authorized by this section.

**(c)** If a civil engineer, surveyor, real estate appraiser, or any of their assistants enters on any private land under the authority of this section or any court order passed pursuant to it, and damages or destroys any land or personal property on it, the owner of the property has a cause of action for damages against the civil engineer, surveyor, real estate appraiser, or assistant and against the State, its instrumentality, or the body politic or corporate on whose behalf the person inflicting the damage was acting.

**(d)** Any landowner or other person who willfully obliterates, damages, or removes any stake, marker, monument, or other landmark set by any civil engineer, surveyor, or real estate appraiser or any of their assistants acting pursuant to this section, except if the stake, marker, monument, or other landmark interferes with the proper use of the property, is guilty of a misdemeanor and on conviction shall be fined not more than $500.

**(e)** Any person who has knowledge of an order issued pursuant to subsection (b) and who obstructs any civil engineer, surveyor, real estate appraiser, or any of their assistants acting under the authority of the order may be punished as for contempt of court.

**(f)** In Anne Arundel County, Montgomery County, or Baltimore City, an agent or employee, or one or more assistants of the jurisdiction, after real and bona fide effort to notify the occupant or the owner, if the land is unoccupied or if the occupant is not the owner, may enter on any private land to make test borings and soil tests and obtain information related to such tests for the purpose of determining the possibility of public use of the property. If an agent, employee, or assistant is refused permission to enter or remain on any private land for the purposes set out in this subsection, Anne Arundel County, Montgomery County, or Baltimore City may apply to a law court of the jurisdiction where the property or any part of it is located for an order directing that its agent, employee, or assistant be permitted to enter and remain on the land to the extent necessary to carry out the purposes authorized by this subsection. The court may require that the applying jurisdiction post a bond in an amount sufficient to reimburse any person for damages reasonably estimated to be caused by test borings, soil tests, and related activities. If any person enters on any private land under the authority of this section or of any court order passed pursuant to it and damages or destroys any land or personal property on it, the owner of the property has a cause of action for damages against the jurisdiction that authorized the entrance. Any person who knows of an order issued under this subsection and who obstructs any agent, employee, or assistant acting under the authority of the order may be punished for contempt of court.

**(g)(1)** The State Highway Administration, the Maryland Transit Administration, and the agents, employees, and consultants of the State Highway Administration and the Maryland Transit Administration may enter upon private property to conduct environmental and engineering studies, including soil boring and excavation, necessary to determine the suitability of the property for use by the administration entering the property. Entry onto private property for these purposes shall not be undertaken without prior consent of the property owner. If, after real and bona fide effort, the consent of the property owner cannot be secured, the administration seeking entry may apply to a law or equity court where the property or any part of it is located for an order directing that entry be permitted. "Bona fide effort" shall include either 30 days advance notice in writing by certified mail return receipt requested to the last known address of the property owner or posting notice on the property not less than 30 days in advance, and such other requirements as the court may deem appropriate. The administration entering the property, when removing,

displacing, boring, or excavating soil under the provisions of this section, shall replace the topsoil in a manner which will approach the level of compaction and contour as when removed. An administration entering private property under the authority of this subsection shall reimburse the landowner or lessee who is farming the property for agricultural products destroyed or damaged by the administration's agents, employees, or consultants and shall be responsible for any other damages that may be incurred as a result of such entry on private property.

**(2)** When the State Highway Administration, the Maryland Transit Administration, or an agent, an employee, or a consultant of the State Highway Administration or the Maryland Transit Administration gives notice to a property owner or posts notice to property in accordance with paragraph (1) of this subsection, the State Highway Administration or the Maryland Transit Administration shall send a copy of the notice to the General Assembly members who represent the legislative district in which the property is located.

## Md. Code Ann., Pub. Util. §1-101

**Definitions.**

**(i)(1)** "Electric company" means a person who physically transmits or distributes electricity in the State to a retail electric customer.

**(2)** "Electric company" does not include:

**(i)** the following persons who supply electricity and electricity supply services solely to occupants of a building for use by the occupants:

> **1.** an owner/operator who holds ownership in and manages the internal distribution system serving the building; or
>
> **2.** a lessee/operator who holds a leasehold interest in and manages the internal distribution system serving the building;

**(ii)** any person who generates on-site generated electricity;

**(iii)** a person who transmits or distributes electricity within a site owned by the person or the person's affiliate that is incidental to a primarily landlord-tenant relationship; or

**(iv)** a person who provides electricity to a commercial or industrial customer in accordance with § 7-506.1 of this article.

## Md. Code Ann., Pub. Util. §7-207

**Certificate of public convenience and necessity required before consutrction of generation station or qualified generator lead line.**

**(a)(1)** In this section the following words have the meanings indicated.

**(2)** "Brownfields site" means:

**(i)** a former industrial or commercial site identified by federal or State laws or regulation as contaminated or polluted;

**(ii)** a closed landfill regulated by the Department of the Environment; or

**(iii)** mined land.

**(3)(i)** "Construction" means:

**1.** any physical change at a site, including fabrication, erection, installation, or demolition; or

**2.** the entry into a binding agreement or contractual obligation to purchase equipment exclusively for use in construction in the State or to undertake a program of actual construction in the State which cannot be canceled or modified without substantial loss to the owner or operator of the proposed generating station.

**(ii)** "Construction" does not include a change that is needed for the temporary use of a site or route for nonutility purposes or for use in securing geological data, including any boring that is necessary to ascertain foundation conditions.

**(4)** "Generating station" does not include:

**(i)** a generating unit or facility that:

**1.** is used for the production of electricity;

**2.** has the capacity to produce not more than 2 megawatts of alternating current; and

**3.** is installed with equipment that prevents the flow of electricity to the electric grid during time periods when the electric grid is out of service;

**(ii)** a combination of two or more generating units or facilities that:

ADD 4

**1.** are used for the production of electricity from a solar photovoltaic system or an eligible customer-generator that is subject to the provisions of § 7-306 of this title;

**2.** are located on the same property or adjacent properties;

**3.** have the capacity to produce, when calculated cumulatively for all generating units or facilities on the property or adjacent property, more than 2 megawatts but not more than 14 megawatts of alternating current; and

**4.** for each individual generating unit or facility:

    **A.** has the capacity to produce not more than 2 megawatts of alternating current;

    **B.** is separately metered by the electric company; and

    **C.** does not export electricity for sale on the wholesale market under an agreement with PJM Interconnection, LLC;

**(iii)** a generating unit or facility that:

**1.** is used for the production of electricity for the purpose of:

    **A.** onsite emergency backup at a facility when service from the electric company is interrupted due to electric distribution or transmission system failure or when there is equipment failure at a site where critical infrastructure is located; and

    **B.** test and maintenance operations necessary to ensure functionality of the generating unit or facility in the event of a service interruption from the electric company due to electric distribution or transmission system failure or when there is equipment failure at a site where critical infrastructure is located;

**2.** is installed with equipment that prevents the flow of electricity to the electric grid;

**3.** is subject to a permit to construct issued by the Department of the Environment; and

**4.** is installed at a facility that is part of critical infrastructure if the facility complies with all applicable regulations regarding noise level and testing hours; or

**(iv)** a combination of two or more generating units or facilities that satisfy item (iii) of this paragraph.

**(5)(i)** "Mined land" means the surface or subsurface of an area in which surface mining operations will be, are being, or have been conducted.

**(ii)** "Mined land" includes:

**1.** private ways and roads used for mining appurtenant to any surface mining area;

**2.** land excavations;

**3.** workings; and

**4.** overburden.

**(6)** "Qualified generator lead line" means an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts and would allow an out-of-state Tier 1 or Tier 2 renewable source to interconnect with a portion of the electric system in Maryland that is owned by an electric company.

**(b)(1)(i)** Except as provided in subparagraph (ii) of this paragraph, unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, a person may not begin construction in the State of:

**1.** a generating station; or

**2.** a qualified generator lead line.

**3.** an energy storage device that is part of a proposal approved by the Commission under § 7-1206 of this title.

**(ii)** A person is not required to obtain a certificate of public convenience and necessity under this section if the person obtains:

**1.** Commission approval for construction under § 7-207.1 of this subtitle; or

**2.** a distributed generation certificate of public convenience and necessity under § 7-207.4 of this subtitle.

**(iii)** Notwithstanding subparagraph (i) of this paragraph, a person may not apply to obtain a certificate of public convenience and necessity for construction of a qualified generator lead line unless:

**1.** at least 90 days before the filing of an application for a certificate of public convenience and necessity, the person had in good faith offered the electric company that owns that portion of the electric grid in Maryland to which the qualified generator lead line would interconnect a full and fair opportunity for the electric company to construct the qualified generator lead line; and

**2.** at any time at least 10 days before the filing of an application for a certificate of public convenience and necessity, the electric company:

**A.** did not accept from the person a proposal or a negotiated version of the proposal under which the electric company would construct the qualified generator lead line; or

**B.** stated in writing that the electric company did not intend to construct the qualified generator lead line.

**(iv)** Notwithstanding any other provision of this section, a certificate of public convenience and necessity for the construction of a generating station that is part of a proposal approved by the Commission under § 7-1206 of this title shall be issued in accordance with § 7-207.4 of this subtitle.

**(v)** When a person applies for a certificate of public convenience and necessity for the construction of a generating station under this section, the application shall state whether the proposed generating station or the proposed modification is part of a proposal approved by the Commission under § 7-1206 of this title.

**(vi) 1.** The Commission may prioritize the review of an application for a certificate of public convenience and necessity under § 7-207.4 of this subtitle over the review of an application for a certificate of public convenience and necessity under this section.

**2.** The Commission may extend the time for the review of an application for a certificate of public convenience and necessity under

this section if, in accordance with sub-subparagraph 1 of this subparagraph, the Commission has prioritized the review of an application for a certificate of public convenience and necessity under § 7-207.4 of this subtitle over the review of the application for a certificate of public convenience and necessity under this section.

**(2)** Unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, and the Commission has found that the capacity is necessary to ensure a sufficient supply of electricity to customers in the State, a person may not exercise a right of condemnation in connection with the construction of a generating station.

**(3)(i)** Except as provided in paragraph (4) of this subsection, unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, a person may not begin construction of an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts or exercise a right of condemnation with the construction.

**(ii)** For construction related to an existing overhead transmission line, the Commission may waive the requirement in subparagraph (i) of this paragraph for good cause.

**(iii)** Notwithstanding subparagraph (i) of this paragraph and subject to subparagraph (iv) of this paragraph, the Commission may issue a certificate of public convenience and necessity for the construction of an overhead transmission line only if the applicant for the certificate of public convenience and necessity:

**1.** is an electric company; or

**2.** is or, on the start of commercial operation of the overhead transmission line, will be subject to regulation as a public utility by an officer or an agency of the United States.

**(iv)** The Commission may not issue a certificate of public convenience and necessity for the construction of an overhead transmission line in the electric distribution service territory of an electric company to an applicant other than an electric company if:

1. the overhead transmission line is to be located solely within the electric distribution service territory of that electric company; and

2. the cost of the overhead transmission line is to be paid solely by that electric company and its ratepayers.

(**v**) 1. This subparagraph applies to the construction of an overhead transmission line for which a certificate of public convenience and necessity is required under this section.

2. On issuance of a certificate of public convenience and necessity for the construction of an overhead transmission line, a person may acquire by condemnation, in accordance with Title 12 of the Real Property Article, any property or right necessary for the construction or maintenance of the transmission line.

(**4**)(**i**) Except as provided in subparagraph (ii) of this paragraph, for construction related to an existing overhead transmission line designed to carry a voltage in excess of 69,000 volts, the Commission shall waive the requirement to obtain a certificate of public convenience and necessity if the Commission finds that the construction does not:

1. require the person to obtain new real property or additional rights-of-way through eminent domain; or

2. require larger or higher structures to accommodate:

A. increased voltage; or

B. larger conductors.

(**ii**) 1. For construction related to an existing overhead transmission line, including repairs, that is necessary to avoid an imminent safety hazard or reliability risk, a person may undertake the necessary construction.

2. Within 30 days after construction is completed under subsubparagraph 1 of this subparagraph, a person shall file a report with the Commission describing the work that was completed.

(**c**)(**1**) On receipt of an application for a certificate of public convenience and necessity under this section, the Commission shall provide notice immediately or require the applicant to provide notice immediately of the application to:

(**i**) the Department of Planning;

**(ii)** the governing body, and if applicable the executive, of each county or municipal corporation in which any portion of the generating station, overhead transmission line, or qualified generator lead line is proposed to be constructed;

**(iii)** the governing body, and if applicable the executive, of each county or municipal corporation within 1 mile of the proposed location of the generating station, overhead transmission line, or qualified generator lead line;

**(iv)** each member of the General Assembly representing any part of a county in which any portion of the generating station, overhead transmission line, or qualified generator lead line is proposed to be constructed;

**(v)** each member of the General Assembly representing any part of each county within 1 mile of the proposed location of the generating station, overhead transmission line, or qualified generator lead line;

**(vi)** for a proposed overhead transmission line, each owner of land and each owner of adjacent land; and

**(vii)** all other interested persons.

**(2)** The Commission, when sending the notice required under paragraph (1) of this subsection, shall forward a copy of the application to:

**(i)** each appropriate State unit and unit of local government for review, evaluation, and comment regarding the significance of the proposal to State, area-wide, and local plans or programs; and

**(ii)** each member of the General Assembly included under paragraph (1)(iv) and (v) of this subsection who requests a copy of the application.

**(3)** On receipt of an application for a certificate of public convenience and necessity under this section, the Commission shall provide notice of the application on the Commission's social media platforms and website.

**(d)(1)(i)** The Commission shall provide an opportunity for public comment and hold a public hearing on the application for a certificate of public convenience and necessity in each county and municipal corporation in which any portion of the construction of a generating station, an overhead transmission line designed to carry a voltage in excess of 69,000 volts, or a qualified generator lead line is proposed to be located.

**(ii)** The Commission may hold the public hearing virtually rather than in person if the Commission provides a comparable opportunity for public comment and participation in the hearing.

**(2)** The Commission shall hold the public hearing jointly with the governing body of the county or municipal corporation in which any portion of the construction of the generating station, overhead transmission line, or qualified generator lead line is proposed to be located, unless the governing body declines to participate in the hearing.

**(3)(i)** Once in each of the 4 successive weeks immediately before the hearing date, the Commission shall provide weekly notice of the public hearing and an opportunity for public comment:

    **1.** by advertisement in a newspaper of general circulation in the county or municipal corporation affected by the application;

    **2.** on two types of social media; and

    **3.** on the Commission's website.

**(ii)** Before a public hearing, the Commission shall coordinate with the governing body of the county or municipal corporation in which any portion of the construction of the generating station, overhead transmission line, or qualified generator lead line is proposed to be located to identify additional options for providing, in an efficient and cost-effective manner, notice of the public hearing through other types of media that are familiar to the residents of the county or municipal corporation.

**(4)(i)** On the day of a public hearing, an informational sign shall be posted prominently at or near each public entrance of the building in which the public hearing will be held.

**(ii)** The informational sign required under subparagraph (i) of this paragraph shall:

    **1.** state the time, room number, and subject of the public hearing; and

    **2.** be at least 17 by 22 inches in size.

**(iii)** If the public hearing is conducted virtually rather than in person, the Commission shall provide information on the hearing prominently on the Commission's website.

(5)(i) The Commission shall ensure presentation and recommendations from each interested State unit, and shall allow representatives of each State unit to sit during hearing of all parties.

(ii) The Commission shall allow each State unit 15 days after the conclusion of the hearing to modify the State unit's initial recommendations.

(e) The Commission shall take final action on an application for a certificate of public convenience and necessity only after due consideration of:

(1) the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station, overhead transmission line, or qualified generator lead line is proposed to be located;

(2) the effect of the generating station, overhead transmission line, or qualified generator lead line on:

(i) the stability and reliability of the electric system;

(ii) economics;

(iii) esthetics;

(iv) historic sites;

(v) aviation safety as determined by the Maryland Aviation Administration and the administrator of the Federal Aviation Administration;

(vi) when applicable, air quality and water pollution; and

(vii) the availability of means for the required timely disposal of wastes produced by any generating station;

(3) the effect of climate change on the generating station, overhead transmission line, or qualified generator lead line based on the best available scientific information recognized by the Intergovernmental Panel on Climate Change;

(4) for a generating station:

**(i)** the consistency of the application with the comprehensive plan and zoning of each county or municipal corporation where any portion of the generating station is proposed to be located;

**(ii)** the efforts to resolve any issues presented by a county or municipal corporation where any portion of the generating station is proposed to be located;

**(iii)** the impact of the generating station on the quantity of annual and long-term statewide greenhouse gas emissions, measured in the manner specified in § 2-1202 of the Environment Article and based on the best available scientific information recognized by the Intergovernmental Panel on Climate Change; and

**(iv)** the consistency of the application with the State's climate commitments for reducing statewide greenhouse gas emissions, including those specified in Title 2, Subtitle 12 of the Environment Article; and

**(5)** for a solar energy generating station specified under § 7-218 of this subtitle, whether the owner of a proposed solar energy generating station complies with the site requirements under § 7-218(f) of this subtitle.

**(f)** For the construction of an overhead transmission line, in addition to the considerations listed in subsection (e) of this section, the Commission shall:

**(1)** take final action on an application for a certificate of public convenience and necessity only after due consideration of:

**(i)** the need to meet existing and future demand for electric service; and

**(ii)** for construction related to a new overhead transmission line, the alternative routes that the applicant considered, including the estimated capital and operating costs of each alternative route and a statement of the reason why the alternative route was rejected;

**(2)** require as an ongoing condition of the certificate of public convenience and necessity that an applicant comply with:

**(i)** all relevant agreements with PJM Interconnection, L.L.C., or its successors, related to the ongoing operation and maintenance of the overhead transmission line; and

(**ii**) all obligations imposed by the North America Electric Reliability Council and the Federal Energy Regulatory Commission related to the ongoing operation and maintenance of the overhead transmission line; and

(**3**) require the applicant to identify whether the overhead transmission line is proposed to be constructed on:

(**i**) an existing brownfields site;

(**ii**) property that is subject to an existing easement; or

(**iii**) a site where a tower structure or components of a tower structure used to support an overhead transmission line exist.

(**g**)(**1**) The Commission may not authorize, and a person may not undertake, the construction of an overhead transmission line that is aligned with and within 1 mile of either end of a public airport runway, unless:

(i) the Federal Aviation Administration determines that the construction of an overhead transmission line will not constitute a hazard to air navigation; and

(ii) the Maryland Aviation Administration concurs in that determination.

(**2**) A privately owned airport runway shall qualify as a public airport runway under this subsection only if the runway has been on file with the Federal Aviation Administration for at least 2 years as being open to the public without restriction.

(**h**)(**1**) A county or municipal corporation has the authority to approve or deny any local permit required under a certificate of public convenience and necessity issued under this section or a distributed generation certificate of public convenience and necessity issued under § 7-207.4 of this subtitle.

(**2**) A county or municipal corporation shall approve or deny any local permits required under a certificate of public convenience and necessity issued under this section or a distributed generation certificate of public convenience and necessity issued under § 7-207.4 of this subtitle:

(**i**) within a reasonable time; and

**(ii)** to the extent local laws are not preempted by State law, in accordance with local laws.

**(3)** A county or municipal corporation may not condition the approval of a local permit required under a certificate of public convenience and necessity issued under this section or a distributed generation certificate of public convenience and necessity issued under § 7-207.4 of this subtitle on receipt of any of the following approvals for any aspect of a generating station, an overhead transmission line, or a qualified lead line proposed to be constructed under the certificate:

**(i)** a conditional use approval;

**(ii)** a special exception approval; or

**(iii)** a floating zone approval.

## Md. Code Ann., Nat. Res. §3-303

**(a)(1)** The Secretary, in consultation with the Director of the Maryland Energy Administration and in cooperation with the Secretaries of the Environment, Agriculture, Commerce, and Planning and electric company representatives shall implement a continuing research program for electric power plant site evaluation, related environmental and land use considerations, and the evaluation of the impact of electric power plants on climate change.

**(2)(i)** The Secretary shall seek from additional sources recommendations for related research to be included in the program.

**(ii)** The additional sources shall include appropriate federal and State agencies, electric companies and technical, scientific, or educational institutions or organizations.

**(3)(i)** The Secretary, in consultation with the Director of the Maryland Energy Administration, shall institute effective procedures for coordinating environmental research assignments to prevent dissipation of money, time, and effort.

(ii) To this end, the State's electric companies shall be reimbursed from the Fund for environmental research specifically required to satisfy application and permit requirements for any federal, State, or local regulatory agencies, if the electric company has requested reimbursement in advance and furnishes an outline of the program and its estimated cost so that the Secretary can budget it in advance.

**(b)** The program shall include:

(1) General biological and ecological baseline studies, including, but not limited to, appropriate environmental studies of the biology, physics, and chemistry of the Chesapeake Bay and tributaries; sediment and biological surveys to determine and identify essential marine organism nursery areas of the State's waters, including the Chesapeake Bay and tributaries; epibenthos; bottom species; crab; finfish and human use studies;

(2) Research to assist prediction, including but not limited to experimental research, field and laboratory, and the development and provision for physical, mathematical, and biological modeling tools to assist in determining and evaluating the effects of variation of natural waters resulting from electric generating plant operations including changes in temperature, oxygen levels, salinity, biocides, radionuclides, and "heavy" metals. This research also includes collection and organization of relevant information and data necessary to operate physical, mathematical, and biological modeling tools;

(3) Provisions for monitoring operations of electric power facilities located in the State. These provisions include but are not limited to a determination of actual distribution and effect of temperature, salinity, oxygen, radionuclides, "heavy" metals, and biological effects; radiological; "heavy" metals and biocide effects; recreational and commercial fishing gains and losses; and human health and welfare effects;

(4) Research and investigations relating to effects on air resources of electric power plants and effects of air pollutants from power plants on public health and welfare, vegetation, animals, materials, and esthetic values, including baseline studies, predictive modeling, and monitoring of the air mass at sites of proposed or operating electric generating stations, evaluation of new or improved methods for minimizing air pollution from power plants and other matters pertaining to the effect of power plants on the air environment;

(5) An environmental evaluation of electric power plant sites proposed for future development and expansion and their relationship to the waters and air of the State;

(6) An evaluation of the environmental effects of new electric power generation technologies and extraordinary systems related to power plants designed to minimize environmental effects;

**(7)** Determining the potential for constructive uses of waste energy to be released at proposed electric plant sites;

**(8)** Analysis of the socioeconomic impact of electric power generation facilities on the land uses of the State;

**(9)** An evaluation of the pollinator benefits that would occur under a pollinator-friendly vegetation management standard or pollinator habitat plan implemented on land:

**(i)** On which a proposed or an existing ground-mounted solar generation facility is located; and

**(ii)** That does not include land that is adjacent to the land on which the solar generation facility is located; and

**(10)** An evaluation of:

**(i)** The greenhouse gas emissions and climate effects of different electric power generation technologies based on the best available scientific information recognized by the Intergovernmental Panel on Climate Change; and

**(ii)** Whether the greenhouse gas emissions and climate effects of electric power generation technologies are consistent with the State's climate commitments for reducing statewide greenhouse gas emissions, including those specified in Title 2, Subtitle 12 of the Environment Article.

## Md. Code Ann., Nat. Res. §3-305

**(f)(1)** For the purposes of performing the duties required under this subtitle, or, upon written request from an electric company setting out the nature, extent, and duration of the work to be done, the Department, its agents, employees, and contractors may enter upon private property to collect data and otherwise conduct environmental and engineering studies related to potential sites for electric generating facilities, potential corridors for rail and pipeline access to electric generating facilities, and potential overhead transmission lines in excess of 69,000 volts. The studies may include the installation of meteorological testing equipment, biological sampling, soil borings, and installation of test wells.

**(2)** Entry onto private property as authorized by paragraph (1) of this subsection shall not be undertaken without prior consent of the property owner. If,

after real and bona fide effort, the consent of the property owner cannot be secured, the Department may apply to the circuit court where the property or any part of it is located for an order directing that entry be permitted. "Bona fide effort" shall include either 30 days' advance notice in writing by certified mail, return receipt requested, to the last known address of the property owner or posting notice on the property not less than 30 days in advance, or such other requirements as the court may deem appropriate.

**(3)** The Department shall reimburse the landowner or lessee who is farming the property for those agricultural products which are either destroyed or damaged by its agents, employees, or contractors. The Department shall be responsible for any other damages that may be incurred as a result of entry on private property as authorized by this section.

## <u>Md. Code Ann., Nat. Res. §3-306</u>

**(a)(1)** Notwithstanding anything to the contrary in this article or the Public Utilities Article, on application to the Public Service Commission for a certificate of public convenience and necessity associated with power plant construction in accordance with § 7-207 of the Public Utilities Article, the Commission shall notify immediately the Department and the Department of the Environment of the application.

**(2)** The Commission shall supply the Department of Natural Resources and the Department of the Environment with any pertinent information available regarding the application.

**(3)** The Department of the Environment shall treat the application for a certificate of public convenience and necessity as an application for:

**(i)** Appropriation or use of waters of the State under Title 5 of the Environment Article; and

**(ii)** A license for dredging and filling under Title 16 of the Environment Article.

**(b)(1)** Subject to paragraph (3) of this subsection, within 6 months after the Commission deems an application complete:

**(i)** The Secretary shall require the Department of Natural Resources to complete an independent environmental and socioeconomic project assessment report and any additional required study and investigation concerning the application; and

**(ii)** The Secretary of the Environment shall require the Department of the Environment to study and investigate the necessity for dredging and filling at the proposed plant site and water appropriation or use.

**(2)(i)** In accordance with the Commission's procedural schedule for an application and subject to paragraph (3) of this subsection, within 6 months after the Commission deems an application complete, the Secretary and the Secretary of the Environment jointly shall submit to the Commission:

> **1.** The results of the studies, investigations, and reports required under paragraph (1) of this subsection;

> **2.** A recommendation that the certificate should be granted or denied and the factual basis for the recommendation; and

> **3.** Subject to subparagraph (ii) of this paragraph, recommended licensing conditions for the construction, operation, or decommissioning of the proposed facility.

> **(ii) 1.** A licensing condition submitted under subparagraph (i) of this paragraph that relates to wetlands, stormwater management, or erosion and sediment control must be consistent with the wetland, stormwater management, and erosion and sediment control requirements in the Environment Article.

> > **2.** A licensing condition submitted under subparagraph (i) of this paragraph that relates to wetlands, stormwater management, or erosion and sediment control may not exceed the authority of the Department of the Environment.

**(3)** The Commission may waive a deadline under this section:

> **(i)** For good cause; or

> **(ii)** On agreement of the parties to the proceeding.

**(c)** The submissions made to the Commission under subsection (b)(2) of this section shall be:

> **(1)** Open for public inspection; and

ADD 19

(**2**) Presented jointly by the Secretary and the Secretary of the Environment, or their designees, at the hearing held by the Commission in accordance with Title 7, Subtitle 2 of the Public Utilities Article.

## Md. Code Regs. 20.79.01.06

**Application Filing Requirements.**

Except for an application for exemption under Regulation .03 of this chapter, an application for a Certificate of Public Convenience and Necessity for the construction of a generating station or transmission line, or an application for modification to an existing electric generating station or transmission line, shall include the following information:

    **A.** The name of the applicant;

    **B.** The address of the principal business office of the applicant;

    **C.** The name, title, mailing address, and email address of the person authorized to receive notices and communications with respect to the application;

    **D.** For a proposed qualifying generating station, the name, title, mailing address, and email address of the community liaison officer, if different from the person named under § C of this regulation;

    **E.** The location or locations at which the public may inspect a copy of the application;

    **F.** A list of each local, state, or federal government agency having authority to approve or disapprove the construction or operation of the project and containing a statement:

        (**1**) Providing the contact information for the local, state, or federal agency or unit;

        (**2**) Indicating whether the necessary approval from each agency has been obtained, with a copy of each approval or disapproval attached;

        (**3**) If necessary approval has not been obtained, specifying the reason why;

        (**4**) If the proposed project is pending review for approval before a local, state, or federal agency or unit, indicating the status and providing a

summary of the review process and expected completion date for the review, if known; and

(5) Indicating whether any waiver or variance has been granted or requested with a copy of each attached;

G. For generating stations, the application shall also include:

(1) A description of the applicant's efforts to consult with the county or municipal corporation in which any portion of the project is proposed to be located, in accordance with Regulation .05 of this chapter, including efforts to resolve issues presented by the county or municipal corporation;

(2) Any preliminary report provided by the affected county or the municipal corporation under Regulation .05 of this chapter;

(3) If the affected county or municipal corporation did not provide the applicant with a preliminary report under Regulation .05 of this chapter:

(a) A copy of any letter from the affected county or municipal corporation regarding the pendency of the county's or municipal corporation's review of the proposed project, if available, and, if not, a written statement indicating the status of the review, if known; and

(b) Any written correspondence exchanged with the affected county or municipal corporation discussing the county's or municipal corporation's review of the proposed project and the project's consistency with the local comprehensive plan and zoning ordinance, if available;

H. The information required under COMAR 20.79.04.01 for transmission lines;

I. A description of the generating station or generating station modification under COMAR 20.79.03.01, or the transmission line or the modification to an existing transmission line under COMAR 20.79.04.02 and .03;

J. An implementation schedule for the proposed project, including, for generating stations, the construction, operation, and expected decommissioning of the project;

**K.** The environmental, natural resources, and socioeconomic information:

**(1)** Required under COMAR 20.79.03 for generating stations; or

**(2)** Required under COMAR 20.79.04 for transmission lines;

**L.** The EJSCREEN reports required under COMAR 20.79.03.05 for a proposed qualifying generating station;

**M.** A signed statement of public engagement and participation certification, required under COMAR 20.79.03.06 for a proposed qualifying generating station, that the applicant made at least one attempt to engage the affected communities pursuant to Regulation .04B of this chapter prior to filing the application;

**N.** If the applicant believes that a requirement for a complete application under this regulation is not applicable to a project, a statement explaining why the requirement is not applicable; and

**O.** If the applicant requests a waiver of any requirement under this regulation, a statement explaining why the applicant believes the requirement should be waived.

## Md. Code Regs. 20.79.04.04

**Environmental Information.**

The environmental information shall include:

**A.** A general description of the physical, biological, aesthetic, and cultural features, and conditions of the site and adjacent areas;

**B.** A summary of the environmental and socioeconomic effects of the construction and operation of the project, including a description of the unavoidable impacts and recommended mitigation;

**C.** A copy of all studies of the environmental impact of the proposed project prepared by the applicant; and

**D.** A statement of the ability to conform to the applicable environmental standards.